THE JERSEY CITY PRINTING COMPANY

63  759
65  663

v.

JAMES CASSIDY et al.

[Filed December 11th, 1902.]

' 1. The right of workmen to combine and to cease their employment in a body is as absolute as the right of an employer to discharge any number of men in his employment.

· 2. Union workmen have the right to strike on the employer's refusal to discharge non-union men in his employ.

. 3. Employers, where third parties interfere with their employes against the latter's consent and endeavor, by threats or persuasions, to have the employes under contract to render service break their contract and quit the service, have a right to an injunction to restrain such third persons from so interfering with their employes.

^ 4. Employers, where third persons interfere with persons willing to be employed, against the latter's consent, by personal molestation, with intent to coerce such persons to refrain from entering such employment, and by personal annoyance, have a right to an injunction to restrain such third persons from so interfering with the persons seeking employment, such interference being an invasion of the right of employers to have labor flow freely to them.

5. An injunction order, granted on the filing of a bill for an injunction by an employer against his former employes, restraining the latter from interfering with other men employed under contract or with men willing to work, will not be set aside on the hearing of a motion on *ex parte* affidavits, but will be continued until final hearing.

---

On motion, on order to show cause, for an injunction to restrain defendants, former employes of the complainant, and now on strike, from unlawful interference with the complainant's business, the employment of workmen, &c. Heard on bill, answer and affidavits.

Upon filing the bill an order was made restraining the defendants

"from in any manner knowingly and intentionally causing or attempting to cause by threats, offers of money, payment of money, offering to pay

Jersey City Printing Co. *v.* Cassidy.

or the payment of transportation expenses, inducements or persuasions to any employe of the complainant under contract to render service to it to break such contract by quitting such service; from any and all personal molestation of persons willing to be employed by complainant with intent to coerce such persons to refrain from entering such employment; from addressing persons willing to be employed by complainant against their will and thereby causing them personal annoyance with a view to persuade them to refrain from such employment; from loitering or picketing in the streets near the premises of complainant, Nos. 68 and 70 York street, and No. 37 Montgomery street, Jersey City, with intent to procure the personal molestation and annoyance of persons employed or willing to be employed by complainant and with a view to cause persons so employed to quit their employment, or persons willing to be employed by complainant to refrain from such employment; from entering the premises of complainant, Nos. 68 and 70 York street, Jersey City, against its will with intent to interfere with its business; from violence, threats of violence, insults, indecent talk, abusive epithets practiced upon any persons without their consent with intent to coerce them to refrain from entering the employment of complainant, or to leave its employment."

*Mr. George G. Tennant,* for the complainant.

*Mr. John J. Fallon,* for the defendants.

STEVENSON, V. C. (orally).

The bill is filed to restrain a body of workmen, who are on a strike, and other persons associated with them, from doing certain things which are alleged to be injurious to the complainant, their former employer. The things that they are restrained from doing are specified in the restraining order. That order was not made hastily. It was formulated with care on the part of the court, and I do not understand that counsel for the defendant criticises its terms on the ground that they are too broad. The defence is that the persons who are enjoined have not been doing, and are not threatening now to do, any of those things that are interdicted. That is the sum and substance of the defence, which has been presented by a great many affidavits and with very great force.

The order does not interfere with the right of the workmen to cease his employment for any reasons that he deems sufficient. It does not undertake to say that workmen may not refuse to be employed if certain other classes of workmen are

retained in employment. It leaves the workman absolutely free to abstain from work—for good reasons, for bad reasons, for no reasons. His absolute freedom to work, or not to work, is not in any way impaired. The restraining order is based upon the theory that the right of the workman to cease his employment, to refuse to be employed, and to do that in conjunction with his fellow-workmen, is just as absolute as is the right of the employer to refuse further to employ one man, or ten men, or twenty men who have theretofore been in his employment. From an examination of the cases and a very careful consideration of the subject I am unable to discover any right in the courts, as the law now stands, to interfere with this absolute freedom on the part of the employer to employ whom he will, and to cease to employ whom he will; and the corresponding freedom on the part of the workman, for any reason or no reason, to say that he will no longer be employed; and the further right of the workmen, of their own free will, to combine and meet as one party, as a unit, the employer who, on the other side of the transaction, appears as a unit before them. Any discussion of the motives, purposes or intentions of the employer in exercising his absolute right to employ or not to employ as he sees fit, or of the free combination of employes in exercising the corresponding absolute right to be employed or not as they see fit, seems to me to be in the air.

Thus, there is a wide field in which employes may combine and exercise the arbitrary right of "dictating" to their common employer "how he shall conduct his business." The exact correlative of this right of the employe exists, in an equal degree, in the employer. He may arbitrarily "dictate" to five thousand men in his employ in regard to matters in respect of which their conduct ought, according to correct social and ethical principles, to be left entirely free. But if the "dictation" is backed up solely by the announcement that, if it is not submitted to, the dictating party will refrain from employing, or refrain from being employed, as the case may be, no legal or equitable right belonging to the party dictated to, which I am able to discern, is thereby invaded.

Some of the expressions which I have used, and which are

commonly used, in relation to this subject seem to me to be misleading. Union workmen who inform their employer that they will strike if he refuses to discharge all non-union workmen in his employ are acting within their absolute right, and, in fact, are merely dictating the terms upon which they will be employed. All such terms necessarily relate both to "how the employer shall conduct his business" and how the employes shall conduct their business.

The doctrine of the old cases, of which we have in New Jersey an interesting example in *State* v. *Donaldson, 3 Vr. 151,* which placed the employe, when acting in combination with his fellow-workmen, at a tremendous disadvantage as compared with his employer, I think may be regarded as entirely exploded. The authority of the deliverances of the supreme court in *State* v. *Donaldson* was largely, if not entirely, abolished by statute in 1883.

The principles which I have endeavored to state are all recognized in the restraining order in this case, and are so plainly recognized that the intelligent and industrious counsel for the defendants is unable to point out any respect wherein the terms of the order should be modified. The things which the restraining order interdicts are things which, for the purposes of this argument, it is practically conceded the defendants have no right to do.

In this situation of the case it would seem to be unnecessary to further consider the legal propriety of the restraining order, much less to take it up clause by clause. I have, however, pointed out what conduct on the part of the defendants is excluded from the operation of this order, and I think that it is fair to all the parties to this suit who are concerned in the maintenance of the restraining order to explain, at least in a general way, what conduct is included within its prohibition. This can be most conveniently done by making plain the most important principles embodied in the order—principles which practically have been developed by the courts of this country and England during the last five or ten years.

The injunction in strike and boycott cases is of very recent use. Already a wide difference of opinion has been developed

among judges in regard to the liability of a combination of workmen to actions at law for damages and suits in equity for an injunction.

It is only very recently, I think, that one of the most important rights which now are vindicated by the injunction in a strike case has been differentiated; in many cases it has been apparently half recognized or indirectly enforced.

That the interest of an employer or an employe in a contract for services is property is conceded. Where defendants, in combination or individually, undertake to interfere with and disrupt existing contract relations between the employer and the employe, it is plain that a property right is directly invaded. The effect is the same whether the means employed to cause the workman to break his contract, and thus injure the employer, are violence or threats of violence against the employe or mere molestation, annoyance or persuasions. In all these cases, whatever the means may be, they constitute the cause of the breaking of a contract, and consequently they constitute the natural and proximate cause of damage. The intentional doing of anything by a third party which is the natural and proximate cause of the disruption of a contract relation, to the injury of one of the contracting parties, is now very generally recognized as actionable, in the absence of a sufficient justification, and the question, in every case, seems to turn upon justification alone.

Where the tangible property of an employer is seized or directly injured by violence, with intent to interfere with the carrying on of his business, the case, also, is free from embarrassment.

In the case of *Frank* v. *Herold, 18 Dick. Ch. Rep. 443,* Vice-Chancellor Pitney amply discussed the whole subject of the unlawfulness of molestation and annoyance of employes, with intent and with the effect to induce them to abandon their employment, to the injury of their employer's business.

But the difficult case presents itself when the workmen in combination undertake to interfere with the freedom of action on the part of other workmen who naturally would seek employment where they (the workmen in combination) desire and

intend that no man shall be employed excepting upon their terms.

The difficulty is in perceiving how molestation and annoyance, not of the employes of a complainant, but of persons who are merely looking for work and may become employes of the complainant, can be erected into a legal or equitable grievance on the part of the complainant. But the difficulty is still further increased where the possible employes make no complaint to any court for protection, and the conduct of the molesting party does not afford a basis which the ancient common law recognized as sufficient to support an action of tort on their behalf, such as for an assault and battery or a slander. Abusive language is not necessarily actionable at the common law. If to call a man a "scab" in the street or to follow him back and forth from his home to his place of employment was formerly not actionable on behalf of the victim of this petty annoyance, the problem is to understand how one who is merely the victim's possible employer can complain, either at law or in equity, there being no actual contract for service, but only a potential one, interfered with.

It is easier, I think, to obtain a correct idea of the legal and equitable right which underlies many of the injunctions which have been granted in these strike cases restraining combinations of workmen from interfering with the natural supply of labor to an employer, by means of molestation and personal annoyance, if we exclude from consideration the conduct of the defendants as a cause of action on behalf of the immediate victims of their molestation—*i. e.,* of the workman or workmen whom the combination are seeking to deter from entering into the employment which is offered to them, and which they, if let alone, would wish to accept. I say this, although I firmly believe that the molested workman, seeking employment and unreasonably interfered with in this effort by a combination, has an action for damages at common law, and, where the molestation is repeated and persistent, has the same right to an injunction, in equity, which, under the same circumstances, is accorded to his contemplated employer.

The underlying right in this particular case under considera-

tion, which seems to be coming into general recognition as the subject of protection by courts of equity, through the instrumentality of an injunction, appears to be the right to enjoy a certain free and natural condition of the labor market, which, in a recent case in the house of lords, was referred to, in the language of Lord Ellenborough, as a "probable expectancy." This underlying right has otherwise been broadly defined or described as the right which every man has to earn his living, or to pursue his trade or business, without undue interference, and might otherwise be described as the right which every man has, whether employer or employe, of absolute freedom to employ or to be employed. The peculiar element of this perhaps newly-recognized right is that it is an interest which one man has in the freedom of another. In the case before this court the Jersey City Printing Company claims the right, not only to be free in employing labor, but also the right that labor shall be free to be employed by it, the Jersey City Printing Company.

A large part of what is most valuable in modern life seems to depend more or less directly upon "probable expectancies." When they fail, civilization, as at present organized, may go down. As social and industrial life develops and grows more complex these "probable expectancies" are bound to increase. It would seem to be inevitable that courts of law, as our system of jurisprudence is evolved to meet the growing wants of an increasingly complex social order, will discover, define and protect from undue interference more of these "probable expectancies."

In undertaking to ascertain and define the rights and remedies of employers and employes, in respect of their "probable expectancies" in relation to the labor market, it is well not to lose sight altogether of any other analogous rights and remedies which are based upon similar "probable expectancies." It will probably be found in the end, I think, that the natural expectancy of employers in relation to the labor market and the natural expectancy of merchants in respect to the merchandise market must be recognized to the same extent by courts of law and courts of equity and protected by substantially the same rules.

It is freedom in the market, freedom in the purchase and sale of all things, including both goods and labor, that our modern law is endeavoring to insure to every dealer on either side of the market. The valuable thing to merchant and to customer, to employer and to employe, manifestly is freedom on both sides of the market. The merchant, with his fortune invested in goods and with perfect freedom to sell, might be ruined if his customers were deprived of their freedom to buy; the purchaser, a householder, seeking supplies for his family, with money in his pocket and free to buy, might find his liberty of no value and might suffer from lack of food and clothing if the shopmen who deal in these articles were so terrorized by a powerful combination as to be coerced into refusing to sell either food or clothing to him.

It is, however, the right of the employer and employe to a free labor market that is the particular thing under consideration in this case.

A man establishes a large factory where working people reside, taking the risk of his being able to conduct his industry and offer these working people employment which they will be willing to accept. He takes the risk of destructive competition and a large number of other risks, out of which, at any time, may come his financial ruin and the suspension of his manufacturing works. But our law, in its recent development, undertakes to insure to him, not only that he may employ whom he pleases, but that all who wish to be employed by him may enter into and remain in such employment freely, without threats of harm, without unreasonable molestation and annoyance from the words, actions or other conduct of any other persons *acting in combination.* What is the measure or test by which the conduct of a combination of persons must be judged in order to determine whether or not it is an unlawful interference with freedom of employment in the labor market, and as such injurious to an employer of labor in respect of his "probable expectancies," has not as yet been clearly defined. Perhaps no better definition could be suggested than that which may be framed by conveniently using that important legal fictitious person who has taken such a large part in the development of our law during

the last fifty years—the reasonably prudent, reasonably courage-ous and not unreasonably sensitive man. Precisely this same standard is employed throughout the law of nuisance in deter-mining what degree of annoyance on the part of one's neighbor one must submit to, and what degree of such annoyance is ex-cessive and the subject of an action for damages or a suit for an injunction.

A man may not be liable to an action for slander for calling a workman a "scab" in the street, but if a hundred men combine to have this workman denounced as a "scab" in the street, or fol-lowed in the streets to and from his home, so as to attract public attention to him and place him in an annoyingly conspicuous position, such conduct, the result of such combination, is held to be an invasion of the "probable expectancy" of his employer or contemplated employer, an invasion of this employer's *right to have labor flow freely to him*. Without any regard to the rights and remedies which the molested workman may have, the injunc-tion goes at the suit of the employer to protect his "probable expectancy"—to secure freedom in the labor market to employ and to be employed, upon which the continuance of his entire industry may depend.

I think it is safe to say that all through this development of strike law, during the last decade, no principle becomes estab-lished which does not operate equally upon both employer and employe. The rights of both classes are absolutely equal in respect of all these "probable expectancies." An operator upon printing machines has the right to offer his labor freely to any of the printing shops in Jersey City. These shops may all com-bine to refuse to employ him on account of his race, or mem-bership in a labor union, or for any other reason, or for no reason, precisely as twenty employes in one printing shop may combine and arbitrarily refuse to be further employed unless the business is conducted in accordance with their views. But in the case of the operative seeking employment, he has a right to have the action of the masters of the printing shops, in reference to employing him, left absolutely free. If, after obtaining, or seek-ing to obtain, employment in a shop, the master of that shop should be subjected to annoyances and molestation, instigated by

the proprietors of other printing shops, who combine to compel, by such molestation and annoyance, this one master printer, against his will and wish, to exclude the operative from employment, this operative, in my judgment, would have a right to an action at law for damages, and would have a right to an injunction if his case presented the other ordinary conditions upon which injunctions issue. But the common law courts have not had time to speak distinctly on this subject as yet, and it is necessary to be cautious in dealing with a subject in which both courts of law and courts of equity as yet are feeling their way.

I think that the leading principle enforced in the restraining order in this case is not inconsistent with any authorities which control this court. This principle is that a combination of employers, or a combination of employes, the object of which is to interfere with the freedom of the employer to employ, or of the employe to be employed (in either of which cases there is an interference with the enjoyment of a "probable expectancy," which the law recognizes as something in the nature of property), by means of such molestation or personal annoyance as would be liable to coerce the person upon whom it was inflicted, assuming that he is reasonably courageous and not unreasonably sensitive, to refrain from employing or being employed, is illegal and founds an action for damages on the part of any person knowingly injured in respect of his "probable expectancy" by such interference, and also, when the other necessary conditions exist, affords the basis of an injunction from a court of equity.

The doctrine which supports that portion of the restraining order in this case which undertakes to interdict the defendants from molesting applicants for employment as an invasion of a right of the complainant, is applicable to a situation presenting either an employer or an employe as complainant, and containing the following elements:

*First.* Some person or persons desiring to exercise the right of employing labor, or the right of being employed to labor.

*Second.* A combination of persons to interfere with that right, by molestation or annoyance, of the employers who would employ, or of the employes who would be employed, in the absence of such molestation.

Jersey City Printing Co. *v.* Cassidy.

How far the element of combination of a number of persons will finally be found necessary, in order to make out the invasion of a legal or equitable right in this class of cases, need not be discussed. We are dealing with cases where powerful combinations of large numbers, in fact, exist.

*Third.* Such a degree of molestation as might constrain a person having reasonable fortitude, and not being unreasonably sensitive, to abandon his intention to employ or to be employed, in order to escape such molestation.

*Fourth.* As the result of the foregoing conditions, an actual pecuniary loss to the complaining party, by the interference with his enjoyment of his "probable expectancies" in respect of the labor market.

I do not think that the constraining force brought to bear upon the employer or employe which the law can interdict can ever include the power of public opinion or even of class opinion. Every man, whether an employer or an employe, constitutes a part of a great industrial system, and his conduct is open to the criticism of the members of his own class. While, therefore, a combination of union men have no right to cry "scab" in the streets to non-union employes, or follow then in the street in a body to and from their homes, or do many other things *in combination,* which, if done once by a single individual, would not found an action of tort, such combinations, I think, have left a fairly wide field of effort towards the creation and application of public opinion as a constraining force upon conduct of any kind which they wish to discourage.

I have endeavored to explain, in a general way, my own view of the most important and least understood principle embodied in the restraining order in this case, in order that the defendants, and, in fact, all parties interested, may have all possible light in construing and applying the exact terms of the order. What I have said may be found to be subject to modifications, without subjecting the terms of the order to any change. All generalizations on such a subject—such a novel subject as the one under consideration—are dangerous. There may be conduct on the part of a combination of employers, or of employes, which would

49

seem to come within the general definition or description of illegal and prohibited conduct, which I have attempted to frame, but which conduct, nevertheless, might be justified, and hence could not be adjudged illegal. Molestation and personal annoyance, however, the terms which I have employed, do not seem to be inclusive of any justifiable conduct, especially if no one is allowed to complain that he is molested or annoyed by being subjected peaceably to the judgment and criticism of public opinion.

The vice-chancellor then discussed at length the effect of the answer of the defendants and the affidavits annexed thereto, which denied all the charges of interference with existing labor contracts or molestation practiced to prevent new workmen from being employed. The conclusion was that, notwithstanding such denials, even when sustained by the greater weight of evidence, the restraining order should be held in force as to those defendants who stood fairly charged, under oath, with the interdicted misconduct, and should be vacated as to any other defendants not so charged; that the sole issue appeared to be one of fact, viz., whether the defendants had done, and were threatening to do, the acts complained of or not, and that such an issue could not properly be tried on *ex parte* affidavits, but should be reserved for the final hearing; that in a case like this, where the defendants were the only persons in sight apparently interested in having the unlawful conduct complained of continued, and were therefore subjected to a temptation to cause such conduct to be continued, an injunction which merely prevented them from doing acts which they disclaimed any right to do, and denied that they had done or threatened to do, should be retained until the final hearing.