FLORENCE HARRIS, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. HERMAN PERL AND RUTH PERL, DE-FENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND JOHN D. CRONIN AND UNION COUNTY TRUST COMPANY, ETC., DEFENDANTS-RESPONDENTS.

Argued November 19, 1963—Decided February 3, 1964.

456

Mr. *Jerome S. Lieb* argued the cause for plaintiff-appellant and cross-respondent (Mr. *Abraham I. Harkavy,* of counsel; Messrs. *Harkavy & Lieb,* attorneys).

Mr. *Murry D. Brochin* argued the cause for defendants-respondents and cross-appellants Perl (Mr. *Donald G. Marshall,* on the brief; Messrs. *Lowenstein & Spicer,* attorneys).

Mr. *John J. Rush* argued the cause for defendant-respondent Cronin (Mr. *Victor A. DeFilippo,* of counsel; Messrs. *Farley & DeFilippo,* attorneys).

Mr. *Robert P. McDonough* argued the cause for defendant-respondent Union County Trust Company (Mr. *K. L. Estabrook,* of counsel; Messrs. *Lindabury, McCormick & Estabrook,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J.   Plaintiff, Florence Harris, is a licensed real estate broker.   Knowing that defendant Cronin wished to sell his home, plaintiff suggested the property to the defendants Perl.   Plaintiff arranged with Cronin for inspection of the property by the Perls and they visited the premises on three occasions, June 5, July 2, and July 18, 1959.   In negotiations through plaintiff, Cronin came down from a demand of $175,000 to $135,000, while the Perls moved from an offer of $100,000 to $125,000, at which point Perl told plaintiff that if she was "a smart girl," she would reduce her commission.

Meanwhile, on July 2, the defendant Union County Trust Company recorded a deed from Cronin to it, dated May 26. The deed probably was not delivered until on or after June 22.   It appears that Cronin and his father were indebted to the bank for some $600,000, secured by a mortgage on a number of properties including the one in question and that the conveyance was made to satisfy that obligation in part.   By an agreement dated June 22 the Cronins were permitted to remain in possession on a rental basis until December 31, with the express understanding that the bank could show the property to interested buyers at all times.   Thus Cronin was the owner during only part of the period of the negotiations.

On September 3 Mrs. Cronin telephoned plaintiff.   According to plaintiff, Mrs. Cronin said she felt her husband would accept $125,000 if the Perls were still willing to pay that sum.   Mrs. Cronin says she called only to find out if the property was or would be sold because she had the problem of enrollment of her children for the ensuing school year.   Whatever the conversation, plaintiff that day telephoned Perl, who abruptly said he was too busy to talk with her but would after the Labor Day weekend.   In fact Perl did not intend any further discussion.   The reason was that, having learned the day before through a Dr. Wallach that the bank had title, Perl had hurriedly submitted an offer directly to the bank for $125,000, free of brokerage to anyone.   A contract on that

basis was signed by the bank on September 4, the day after plaintiff's call.

Plaintiff learned of the contract when she telephoned Mrs. Perl on September 8, the day after Labor Day. It was then that plaintiff discovered that Cronin had conveyed to the bank. Prior thereto she knew only that the bank held the mortgage and that a *lis pendens* indicated foreclosure proceedings had been instituted in 1957, but there was no reason for plaintiff to suppose that Cronin could not complete a sale.

Plaintiff sued Cronin, the bank, and the Perls. There were numerous cross-claims among the defendants.

Plaintiff's claim against the bank was on the thesis that Cronin was its agent, and the Perls cross-claimed against the bank charging the bank had fraudulently represented to the Perls that Cronin was not its agent. On motion the bank obtained summary judgment with respect to plaintiff's claim and the Perls' cross-claim, the finding being that Cronin was not the agent of the bank. The Perls sought but were denied leave to cross-claim against the bank on the further basis that, if the Perls were liable, then the bank should contribute as a joint tortfeasor.

Upon trial without a jury the court found in favor of plaintiff against the Perls and in favor of Cronin both on plaintiff's complaint and the cross-claim of the Perls.

The Appellate Division (1) affirmed the judgments in favor of Cronin; (2) reversed plaintiff's judgment against the Perls; and (3) did not reach the appeal of the Perls from the denial of leave to cross-claim against the bank for contribution. We granted certification. 40 *N. J.* 499 (1963).

I.

The issues as between plaintiff and the Perls are (1) whether they breached a duty owing to plaintiff, and (2) whether the breach in fact deprived plaintiff of commissions on the sale. The Appellate Division did not decide the first question, saying that although "the Perls doubtless

treated plaintiff shabbily," it could not find the bank would have recognized her as a broker if the Perls had given her a chance to approach the bank and hence there was no injury. In this connection the Perls had also urged that, since they would not have gone above $125,000 and the bank would not have taken less than that sum net to it, there would never have been a sale if the bank had given plaintiff a brokerage agreement, and accordingly plaintiff was not hurt. We are not certain whether the Appellate Division embraced that additional thought.

It should be stressed that plaintiff was not a meddlesome interloper. She did not intrude upon either the Perls or Cronin. The Perls wanted her to find a home for them. Indeed, through the efforts of plaintiff the Perls were actively considering still another property only a few days before they quietly submitted their offer to the bank through Dr. Wallach. Cronin too was interested in making a deal and of course expected plaintiff to receive a commission if a deal was made.

And although plaintiff had no arrangement with the bank, we are satisfied one could readily have been made. The bank was not opposed to dealing through a broker. One of its officers testified the directors had authorized a sale at "a net to us of $125,000" and that he told Dr. Wallach "if there were no brokerage fees involved, that it would be $125,000." In fact the bank had already asked a firm of brokers to try to move the property. And Perl doubtless believed the bank would deal with plaintiff, for when she telephoned him on September 3, he put her off, lest she learn of the bank's interest before a deal was made and spoil his plan. And we note also that Dr. Wallach objected to the inclusion in the contract of a standard clause used by the bank's attorney to the effect that there was no broker, explaining, without however disclosing plaintiff's identity, that someone had shown the property to the Perls at some time in the past. As a result the clause was changed to read:

"The purchaser represents that at no time did any real estate broker show the premises to him on behalf of Union County Trust

Company, the present owner, and so far as he has knowledge, no one is entitled to be paid real estate commissions on said sale."

The negotiations over the form of the contract thus further revealed that the bank had no policy against sales through brokers and that the emissary of the Perls knew this was so. And finally, the Perls were the only prospect and the bank was anxious to sell.

We think it perfectly clear that the bank would have recognized plaintiff as broker if she had sought recognition before the identity of her prospect was revealed. The question then is whether a person who accepts the services of a broker may surreptitiously appropriate those services to his own profit by buying directly from the owner and justify that action on the ground that the broker had not established some relationship with the seller.

The law protects a man in the pursuit of his livelihood. True, he cannot complain of every disappointment; others too may further their equal interests, and if the means are fair, the advantage should remain where success has put it. But if the act complained of does not rest upon some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed.

Hence one who unjustifiably interferes with the contract of another is guilty of a wrong. And since men usually honor their promises no matter what flaws a lawyer can find, the offender should not be heard to say the contract he meddled with could not have been enforced. "Accordingly, it usually is held that contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, still afford a basis for a tort action when the defendant interferes with their performance." *Prosser, Torts* (2d ed. 1955) § 106, *p.* 726. *Aalfo Co. v. Kinney*, 105 *N. J. L.* 345, 347 (*E. & A.* 1929); *Louis Kamm, Inc. v. Flink*, 113 *N. J. L.* 582, 591 (*E. & A.* 1934); *George H. Beckmann, Inc. v. Charles H.*

*Reed & Sons, Inc.,* 44 *N. J. Super.* 159, 165 (*App. Div.* 1957).

Protection is not limited to contracts already made. The law protects also a man's interest in reasonable expectations of economic advantage. *Harper and James, Torts* § 6.11, *p.* 510 (1956). As Mr. Justice (then Judge) Francis summed it up in *Mayflower Industries v. Thor Corp.,* 15 *N. J. Super.* 337, 339 (*Ch. Div.* 1951), affirmed o. b. 9 *N. J.* 605 (1952):

> "It is no answer to say that the contractual relations were not complete because Thor had not gone through the formality of signing the agreement. This status should not stand in the way of the existence of the right of action. Treating the case (on the facts here) in terms of unlawful interference with prospective economic advantage, the cause of action exists. Prosser puts the principle this way: 'By analogy to interference with existing contractual relations, tort liability has been imposed for interference with prospective advantage.' *Prosser on Torts, p.* 1013. Citing *Brennan v. United Hatters of North America,* 73 *N. J. L.* 729 (*E. & A.* 1906), wherein Justice Pitney declared: 'In a civilized community, which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property, once it is acquired, but left unprotected by the law in his efforts to acquire it. * * *,' Prosser goes on to say: 'and that since a large part of what is most valuable in modern life depends upon the "probable expectancies," as social and industrial life becomes more complex the courts must do more to discover, define and protect them from undue interference.' (*Pp.* 1014–1015; also *Jersey City Printing Co. v. Cassidy,* 63 *N. J. Eq.* 759, at *page* 765, 53 *A.* 230 (*Ch.* 1902) )."

With these principles in mind, let us turn to the present scene. The economic facts and the expectations of fair men with respect to real estate brokerage are clear enough. The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds. The broker's stock in trade is his knowledge of what property is or can be made available and who is or can be interested in a given parcel. The inherent uniqueness of each parcel distinguishes the real estate broker from the salesman of automobiles or cutlery, for the very act of identifying real property or the

prospective purchaser is itself both a rendition of a valuable service and an opportunity for a dishonest man to make off with the broker's stock in trade. In a practical world the broker must trust that those who seek or willingly accept his services will not cheat him of the fruit of his industry. The courts should protect him from that abuse, except insofar as the countervailing policy of the statute of frauds may insulate the owner from liability.

Of course a broker must accept competition from other brokers. *George F. Hewson Co. v. Hopper,* 130 *N. J. L.* 525 (*E. & A.* 1943); *Weinstein v. Clementsen,* 20 *N. J. Super.* 367 (*App. Div.* 1952). Frequently, especially when property is listed widely, several brokers will try to interest the same prospect. In such circumstances, a dispute as to who was the procuring cause should be fought out with the owner, and the purchaser should not be burdened with the quarrel in the absence of fraudulent conduct on his part. But if the purchaser beats the broker out of his commission by buying from the owner directly or through a front, thus appropriating to himself the value of the services of the broker, he should pay for that mischief. *Myers v. Arcadio, Inc.,* 73 *N. J. Super.* 493 (*App. Div.* 1962); *Sustick v. Slatina,* 48 *N. J. Super.* 134 (*App. Div.* 1957); *George H. Beckmann, Inc. v. Charles H. Reed & Sons, Inc., supra,* 44 *N. J. Super.* 159; *McCue v. Deppert,* 21 *N. J. Super.* 591 (*App. Div.* 1952).

In *Louis Kamm, Inc. v. Flink, supra,* 113 *N. J. L.* 582, the complaint alleged that plaintiff broker revealed the name of his prospect to an officer of the owner corporation with the express understanding that the disclosure was in confidence, and that the officer funneled the information to his brother who with others closed the deal and obtained the commission. The court held the complaint was sufficient. Although there an express pledge of confidence was alleged, the court pointed out that a like obligation may be implied in appropriate circumstances (113 *N. J. L.,* at *p.* 589).

■ And so here, when the Perls accepted plaintiff's services, it was with the obligation which all decent men would recognize, that they would not line their purse with the money value of those services. It is of no moment that Cronin was not the agent of the bank and hence plaintiff had no authorization from the record owner. That fact provided an opportunity for overreaching rather than a justification for it. As we pointed out above, the law protects not only contracts but also the reasonable expectations of economic gain. In these circumstances fair play would require a prospective purchaser to permit the broker to seek recognition by the owner, unenticed by the purchaser's offer to deal directly. As we have already said, we have no doubt the bank would have dealt with plaintiff, but the Perls did not give her that opportunity. More than that, Perl lured plaintiff from stumbling upon the truth by deceitfully saying he would discuss the sale after the Labor Day weekend.

■ The remaining point is that both the bank and the Perls were adamant at $125,000 and hence, if plaintiff had been recognized by the bank, there would have been no deal. *Ergo,* no damage. It must be noted at once that if a wrongdoer could advance this position, it could be equally a haven for a seller whose brokerage obligation is plainly set forth in a written contract, since he too could disclaim liability for anything beyond nominal damages upon the premise that he and the buyer would never have reached agreement if the price to be paid included the amount of the promised commission.

Defendants' point is unsound. Even under a brokerage contract carefully drawn from a seller's point of view, the broker earns his commission when title is closed. Here that event occurred and hence plaintiff established the final ingredient of her claim. What the Perls seek to do is to generate an uncertainty which but for their naked assertion would not be in the case. They ask that the Court accept their belief that under no circumstances would they have budged from the figure of $125,000. The claim of course is wholly hypothetical and even the Perls cannot really know how high they

would have gone. The question is whether a wrongdoer should be permitted to avoid real damages by raising an issue made hypothetical by his very wrong. We think he should not. The same contention was rejected in *Johnson v. Gustafson*, 201 *Minn.* 629, 277 *N. W.* 252, 255 (*Sup. Ct.* 1938):

"It seems to us that Clarity's assertion that he would not have paid more than he did ($5,700) in any event comes with poor grace. He was willing to and did concoct a fraudulent scheme. He procured the necessary assistance to bring about a result which, had it not been discovered, would have given him an advantage to the extent of the commission plaintiff was in common honesty entitled to receive. No man should be permitted to reap a profitable crop from seed of the kind here used."

## II.

We are not persuaded to disagree with the findings in favor of Cronin on plaintiff's charge of fraud against him. Cronin acted in good faith. He apparently thought he still owned the property or had an interest along with the bank in the sale of the property. He did not intend to deceive plaintiff. He believed the bank would recognize plaintiff as a broker and we are satisfied that but for the behavior of the Perls the bank would have.

As to the Perls' cross-claim against Cronin, we find no evidence of any wrong. They say he misrepresented his ownership of the property. If that be assumed, still they did not rely upon that representation at all. In fact they sought to profit by their discovery that he was not the owner. Their trouble stems from their own cupidity and not from any misbehavior of Cronin.

Finally we come to the order refusing to permit the Perls to file a cross-claim against the bank for contribution on the theory that the bank was a joint tortfeasor. If we found error in that ruling, we would not disturb the other judgments on that account. Hence at this stage the question is only whether a claim for contribution should be tried in the present cause or in an original suit which the Perls remain

free to bring after paying the judgment in favor of plaintiff. *N. J. S.* 2A:53A-3. We think we should leave it to the Perls to initiate a separate action if they conceive they have a basis for it.

Accordingly (1) the judgment of the Appellate Division with respect to the case of plaintiff against the Perls is reversed and the judgment of the trial court is affirmed, with costs.

(2) The judgment in favor of Cronin as against plaintiff is affirmed, without costs.

(3) The judgment in favor of Cronin as against the Perls is affirmed, with costs.

(4) The order denying the motion of the Perls to cross-claim against the bank for contribution is affirmed, but without costs and without prejudice to the institution of a separate action.

*For reversal in part and affirmance in part*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.