684 A.2d 975

CUSHMAN & WAKEFIELD OF NEW JERSEY, INC., PLAINTIFF–
APPELLANT/CROSS–RESPONDENT, v. ALEXANDER SUM-
MER CO. AND UNITED JERSEY BANK, DEFENDANTS–RE-
SPONDENTS/CROSS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued October 23, 1996—Decided November 18, 1996.

Before Judges BAIME, PAUL G. LEVY, and BRAITHWAITE.

*Paul A. Rowe* argued the cause for appellant/cross-respondent (*Greenbaum, Rowe, Smith, Ravin & Davis*, attorneys; *Mr. Rowe*, of counsel; *Mark H. Sobel* and *Bruce D. Greenberg*, on the brief).

*Theodore W. Geiser* argued the cause for respondents/cross-appellants (*Connell, Foley & Geiser*, attorneys; *Mr. Geiser*, of counsel and on the brief; *Paul T. Fader*, on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

Cushman & Wakefield (C & W) brought this action against Alexander Summer Co. (Summer Company) and United Jersey Bank (UJB) to recover brokerage commissions and punitive damages, alleging tortious interference with contract and tortious interference with prospective economic advantage. The complaint alleged that UJB utilized C & W's brokerage services to obtain leases for its new operations center and for two branch banks. C & W claimed that it introduced UJB to Hartz Mountain, the developer, negotiated the terms of the transactions and caused the procurement of the resulting leases. C & W contended that Summer Company was inserted into the transaction when the leases were imminent because Alexander Summer was a member of the board of directors of UJB and a major shareholder.

Following a protracted non-jury trial, the Law Division found that UJB and Summer Company had wrongfully interfered with C & W's reasonable expectation of economic gain. The court also found that defendants' wrongful conduct resulted in the loss of C & W's commission earned on the lease for UJB's branch banks. C & W was awarded $131,250 in compensatory damages and $400,-000 in punitive damages respecting that transaction. However, the court determined that C & W was not entitled to a commission on the lease for UJB's operations center because the property C & W had introduced to UJB was rejected due to toxic contamination, and another site adjacent to it was ultimately selected.

C & W appeals, contending (1) there was a reasonable probability it would have introduced UJB to the adjacent property had there been no wrongful interference and, therefore, it was entitled to a commission on that transaction, and (2) the Law Division erred by refusing to consider its litigation expenses in the award

of punitive damages. UJB and Summer Company cross-appeal, claiming (1) the Law Division committed error in finding that C & W was the efficient procuring cause of the branch banks lease, (2) punitive damages should not have been granted, and (3) prejudgment interest was improperly awarded from the filing date of the original complaint. Our examination of the voluminous record discloses clear and convincing evidence that defendants wrongfully deprived C & W of commissions due on both the operations center and branch bank leases. We also conclude that the Law Division erred by refusing to consider C & W's reasonable litigation expenses in the punitive damage award. The remaining arguments lack merit.

## I.

C & W is a commercial real estate brokerage firm. In 1983, C & W acquired Baker Merin Associates, a competitor that long served as UJB's principal broker. Andrew Merin and John McCormick, two principals in Baker Merin Associates, joined C & W and continued to assist UJB in its leasing needs following the acquisition.

In March 1984, Leonard Speakman, UJB's head of real estate, requested Merin and McCormick to search for space for an operations center to accommodate the bank's check processing, computer, and accounting functions. Initially, Speakman specified that UJB was seeking 50,000 to 65,000 square feet of space in close proximity to the bank's existing operations center in Hackensack. As time passed, however, UJB repeatedly increased its estimate of the amount of space needed. While Merin originally confined his search to existing facilities, he later expanded his survey to include undeveloped land on which a building could be constructed to suit UJB's specific needs.

Thus, at a relatively early stage, Merin suggested that UJB consider an undeveloped tract in Ridgefield known as the Overpeck Office Park. Merin considered this property attractive for several reasons. It was located in close proximity to UJB's

existing facility in Hackensack, and it was owned by Hartz Mountain, one of New Jersey's largest developers of commercial property. Moreover, Agfa Gavaert, a major customer of UJB, had committed to locating its offices at Overpeck. Merin reasoned that Hartz Mountain could construct a building suitable to UJB's needs as fast as an existing building could be retrofitted.

Although other properties were included in C & W's survey of potential sites, Alan Posencheg, UJB's senior vice-president in charge of operations, centered his attention on the Overpeck property. At a series of meetings in March and April 1985, C & W and UJB representatives examined aerial photographs and proposed plans for constructing a building. Posencheg also toured the site on at least two occasions. Posencheg testified at trial that he "liked the location when [he] first saw it," and became more enthused about the property after eliminating other sites because of traffic and other related problems.

Posencheg raised questions concerning the contemplated road access to the Overpeck area. There were "considerable . . . discussions" about road access from Route 46 and the New Jersey Turnpike. In its marketing brochure, Hartz Mountain represented that the site was "directly accessible from Route 46 to the south." C & W presented evidence indicating that the Hartz Mountain plan envisioned incorporation of an adjacent site known as the Iganamort property consisting of approximately fourteen acres. The plan called for access roads through the Iganamort property. Although Hartz Mountain did not own this land, it had an option to purchase, thus permitting it to incorporate the site into Overpeck.

Another point discussed by UJB, C & W, and Hartz Mountain pertained to UJB's interest in locating property for two branch banks. Eugene Heller, Hartz Mountain's president, expressed his reluctance to provide space for the branch banks unless UJB committed to leasing Hartz Mountain property for the operations center, which was to be much larger in scale and far more profitable.

Meanwhile, also in March and April 1985, Merin and Heller engaged in discussions relating to C & W's brokerage commission should UJB lease space from Hartz Mountain. They agreed that C & W would be paid a commission of five percent of the gross aggregate rental. Although drafts of a commission agreement were exchanged, none was ever executed. Heller nevertheless testified that had UJB leased the Overpeck site, Hartz Mountain would have paid C & W its commission. While it was UJB's policy not to enter into exclusive brokerage agreements, Speakman, at Merin's urging, sent a letter to C & W intended to serve as an "official request to assist [the bank] in the selection of [its] new operations center." Although UJB's interest in relocating its operations center waxed and waned as other projects were accorded priority, the record clearly indicates that by the end of 1985, Posencheg was committed to the Overpeck site.

Summer Company, however, attempted to inject itself into the transaction. Alexander Summer was a director of UJB/Hackensack, UJB's largest subsidiary bank. In February or March 1985, Stephen Palmer, Summer Company's president, met with Speakman and suggested several properties as potential sites for UJB's operations center. Overpeck was not one of the sites discussed. Palmer later described Speakman as "very cool" and unreceptive to Palmer's solicitation.

While the record is not altogether clear, it appears that at some point Speakman told Palmer that C & W was assisting UJB in selecting a site and that attention had focused upon Overpeck. Several weeks after their meeting, Palmer wrote to Speakman thanking him and noting that UJB had apparently "settled on the Hartz Mountain site." However, Summer Company subsequently renewed its solicitation to service UJB's leasing needs. In 1986, UJB hired George Reeder as vice-president of general services. One of Reeder's principal responsibilities was facilities acquisition and development. Speakman became Reeder's subordinate.

Merin testified that Reeder told him he was being "pressured" by Joseph Semrod, UJB's chairman of the board and chief execu-

tive officer, and Albert D'Augusta, UJB's executive vice-president, to grant Summer Company "an exclusive." This was corroborated by Semrod who testified that he directed his "management team" to "consider" hiring Summer Company as UJB's exclusive agent to broker the operations center transaction.

On April 30, 1986, Reeder and D'Augusta met with Alexander Summer and Stephen Palmer. Palmer gave Reeder a survey of potential sites for UJB's operations center. Included in the list was the Overpeck site. A series of meetings followed, culminating in UJB's decision in January 1987 to retain Summer Company as its exclusive broker.

Shortly after this decision was made, Posencheg telephoned Palmer and reiterated that UJB harbored a "real interest" in the Overpeck site. No other property was discussed. Palmer then contacted Heller. In February 1987, UJB retained consultants for the design and construction of the operations center. The consultants met with Palmer who provided various site selection data. The consultants prepared a report in which four "final site selections" were evaluated on the basis of a "matrix" of criteria. Not surprisingly, the consultants recommended the Overpeck site. On June 5, 1987, UJB and Summer Company executed an agreement conferring upon Summer Company the exclusive right to obtain a lease for UJB's operations center. The original draft of the agreement included an indemnification clause under which Summer Company promised to hold UJB harmless for any claim for commissions by C & W. This clause was later deleted and another indemnification provision was added. The clause appearing in the final agreement included Summer Company's promise to hold UJB harmless for any claim for commissions by "other" real estate brokers.

We now come to the denouement that makes this case difficult. On October 21, 1987, UJB's board of directors approved the location of a 300,000 square foot operations center at Overpeck. Following the board's approval, UJB's insurance broker recommended that alternative locations be considered because of envi-

ronmental contamination at the site selected. All of the parties had been aware that the Overpeck site was a closed residential landfill. Indeed, an independent expert retained by the bank had noted the problem, but found that no health hazards existed. UJB's insurance broker nevertheless determined that the bank would not receive favorable pricing on insurance coverage.

When apprised of the problem, Heller testified that he immediately offered to construct the operations center on the adjacent property, the Iganamort site, to which Hartz Mountain had the lease and option to buy. Heller told Posencheg "we would move his building over a couple thousand feet" to the adjacent site. According to Heller, Posencheg was "pleased" with this proposal and "eventually the deal was [completed]." Posencheg's testimony substantially corroborated that of Heller. According to Posencheg, upon being told about the environmental problem at Overpeck, Heller "approached [him] with an option" to construct the building at the adjacent site. Palmer's account differed. He testified that he, not Heller, suggested the use of the adjacent site as an alternative to Overpeck.

On December 12, 1988, UJB and Hartz Mountain executed a lease for a "build to suit" building of approximately 300,000 square feet. The material terms of the lease were essentially identical to those that had been agreed upon for the Overpeck site. In addition, UJB leased two retail branches from Hartz Mountain in conjunction with the operations center transaction. Summer Company received $3,721,875 as commission for brokering the operations center transaction and $131,250 for brokering the branch banks' lease.

Against this factual backdrop, the Law Division found that UJB and Summer Company tortiously interfered with C & W's reasonable expectation of earning commissions in the two related transactions. The court emphasized that Summer and Palmer knew C & W had introduced UJB to the Overpeck site and to the properties upon which UJB ultimately located its branch banks. The court also found that UJB had essentially committed itself to

these properties by the time UJB granted Summer Company its "exclusive" right to broker the leases, and that Summer Company's "search" for an available site constituted a sham designed to conceal C & W's vital role in introducing the parties and negotiating the transactions. The court concluded that C & W was entitled to its commission for brokering the two branch bank transactions and to punitive damages based upon defendants' deceitful conduct. The court "reluctantly" denied C & W's claim for damages respecting UJB's operations center lease because the site upon which that building was constructed was "not the same property that C & W introduced ... to UJB." While acknowledging that "C & W would have arrived at a comparable result if [it had been] allowed to finish the work," the court concluded that a broker may not recover a commission where it "produces a purchaser for property that does not close."

## II.

The applicable principles are well-settled. "The law protects a person in the pursuit of his livelihood." *Harris v. Perl*, 41 *N.J.* 455, 461, 197 *A*.2d 359 (1964); *Louis Kamm, Inc. v. Flink*, 113 *N.J.L.* 582, 586, 175 *A.* 62 (E. & A.1934); *Mayflower Industries v. Thor Corp.*, 15 *N.J.Super.* 337, 339, 83 *A*.2d 366 (Ch.Div.1951), *aff'd*, 9 *N.J.* 605, 89 *A*.2d 242 (1952). Thus, one who unjustifiably interferes with the contract of another is guilty of a wrong. *C.B. Snyder Realty Co. v. National Newark & Essex Banking Co.*, 14 *N.J.* 146, 164, 101 *A*.2d 544 (1953). "Protection is not limited to contracts already made." *Harris v. Perl*, 41 *N.J.* at 462, 197 *A*.2d 359. The law also protects a person's interest in reasonable expectations of economic advantage. *Ibid.; Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 751, 563 *A*.2d 31 (1989).

A person claiming that another has tortiously interfered with his economic advantage must "show some protectable right—a prospective economic or contractual relationship." *Ibid.* He must additionally show that defendant intentionally interfered and that

the conduct was offensive to legitimate interests of competition among fair persons similarly situated. *Ibid.; see also Harris v. Perl*, 41 *N.J.* at 461, 197 *A.*2d 359; *Kopp, Inc. v. United Technologies, Inc.*, 223 *N.J.Super.* 548, 559, 539 *A.*2d 309 (App.Div.1988); *Levin v. Kuhn Loeb & Co.*, 174 *N.J.Super.* 560, 573, 417 *A.*2d 79 (App.Div.1980). The claimant must further prove that the interference caused the loss of the prospective gain. *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* at 751, 563 *A.*2d 31. It must be shown that there was a reasonable likelihood the victim of the interference would have received the anticipated economic benefit but for the defendant's wrongful conduct. *Leslie Blau Co. v. Alfieri*, 157 *N.J.Super.* 173, 185–86, 384 *A.*2d 859 (App.Div.), *certif. denied*, 77 *N.J.* 510, 391 *A.*2d 523 (1978).

These principles have often been applied to permit recovery of brokerage commissions. *See, e.g., Harris v. Perl*, 41 *N.J.* 455, 197 *A.*2d 359; *Louis Schlesinger Co. v. Rice*, 4 *N.J.* 169, 72 *A.*2d 197 (1950); *Mina L. Smith, Inc. v. Cyprus Indus. Minerals Co.*, 178 *N.J.Super.* 7, 427 *A.*2d 1114 (App.Div.1981); *Leslie Blau Co. v. Alfieri*, 157 *N.J.Super.* 173, 384 *A.*2d 859; *Geo. H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc.*, 44 *N.J.Super.* 159, 130 *A.*2d 48 (App.Div.1957); *Fitt v. Schneidewind Realty Corp.*, 81 *N.J.Super.* 497, 196 *A.*2d 26 (Law Div.1963). The law protects the right to pursue the real estate brokerage business. *Leslie Blau Co. v. Alfieri*, 157 *N.J.Super.* at 185, 384 *A.*2d 859 (citing *Louis Kamm, Inc. v. Flink*, 113 *N.J.L.* 582, 175 *A.* 62 (E. & A.1934)). "The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds." *Harris v. Perl*, 41 *N.J.* at 462, 197 *A.*2d 359. It has thus been said that "[t]he broker's stock in trade is his knowledge of what property is or can be made available and who is or can be interested in a given parcel." *Ibid.* "[T]he very act of identifying real property or the prospective purchaser is itself both a rendition of a valuable service and an opportunity for a dishonest [person] to make off with the broker's stock in trade." *Id.* at 462–63, 197 *A.*2d 359. That is not to say that a broker may complain of every disappoint-

ment. "[O]thers too may further their equal interests, and if the means are fair, the advantage should remain where success has put it." *Id.* at 461, 197 *A*.2d 359. However, "if the act complained of does not rest upon some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair [people] ..., the ensuing loss should be redressed." *Ibid.*

■ The wrongful act must be found to have interfered with some legitimate expectancy on the part of the plaintiff. "[T]he broker who first 'finds' a potential customer and arouses his interest in the matter which the broker is promoting [does not] acquire[ ] an exclusive right to develop that interest into an actual business transaction." *McLaughlin v. Weichert Co. Realtors*, 218 *N.J.Super.* 63, 68, 526 *A*.2d 1119 (App.Div.1987) (quoting *Weinstein v. Clementsen*, 20 *N.J.Super.* 367, 374, 90 *A*.2d 77 (App.Div. 1952)). Frequently, several brokers will try to interest the same prospect, and it is not unusual that one reaps what another sows. However, "[w]hen the broker has brought together a customer and an owner and there is no substantial break in the ensuing negotiations, the broker is considered to have been the efficient cause of the sale and to have entitled himself to a commission." *Fitt v. Schneidewind Realty Corp.*, 81 *N.J.Super.* at 504, 196 *A*.2d 26. The rule has been stated thusly:

> The term "procuring cause" as used in describing a broker's activity refers to a cause originating a series of events which, without break in their continuity, result in accomplishment of the prime objective of employment of the broker, which usually consists of procuring a purchaser ready, willing and able to buy property on the owner's terms or of effecting a sale. The negotiations with the customer or prospect need not be uninterrupted so long as the continuity of the broker's agency in bringing the transaction to a conclusion can be established. But if the negotiations are broken off and the broker thereafter abandons his efforts, or there is a substantial break in negotiations and the transaction is subsequently concluded by the principal without the aid of the broker, he may be denied any commissions.
>
> [*Leadership Real Estate v. Harper*, 271 *N.J.Super.* 152, 184, 638 *A*.2d 173 (Law Div.1993) (quoting 12 *Am.Jur.2d Brokers* § 190 at 932 (1964)).]

■ Applying these principles, we find substantial, credible evidence in the record supporting the Law Division's conclusion that defendants tortiously interfered with C & W's prospective economic gain. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.*

474, 484, 323 A.2d 495 (1974). Merin brought the parties together, negotiated the principal terms of the transactions, and harbored the reasonable expectation that he would be compensated for his efforts. We do not doubt that UJB had the right to terminate Merin's services at any time during the negotiations. But it did not have the right to arrogate to itself or to Summer Company the fruits of Merin's labors. In these circumstances, fair play required UJB to permit C & W to seek recognition by Hartz Mountain, unenticed by UJB's insertion of Summer Company into the transaction. We have no doubt that Hartz Mountain would have paid C & W its commission but for defendants' interference. Heller said so at trial. However, UJB did not give Hartz Mountain that opportunity. Instead, it insisted upon recognition of Summer Company, which at that point was merely a meddlesome interloper. Because the lease for the branch banks was ultimately executed, C & W was entitled to its commission.

■ More troublesome is C & W's claim to a commission for the operations center lease. At issue is whether UJB's rejection of the Overpeck site because of toxic contamination and its acceptance of the adjacent property for construction of the operations center constituted a "substantial break" in the transaction. We view the question in terms of whether a wrongdoer should be permitted to avoid damages by raising an issue made hypothetical by his very wrong. We think not.

We have found no reported opinion permitting a broker to recover a commission where the property sold or leased was not that which was shown to the customer. Neither our own endeavors nor those of counsel have produced any case with a similar factual pattern. We thus seek a reasonable accommodation within the framework of traditional tort law remedies for behavior which is both injurious and transgressive of generally accepted standards of morality and fair competition. "The very nature of the tort prohibits a 'rule of thumb' in every case." *Leslie Blau Co. v. Alfieri*, 157 *N.J.Super.* at 187, 384 A.2d 859 (citing 1 Harper and James, *Law of Torts*, § 6.12 at 515 (1956)). Since the behavior

bilking brokers of their legitimately expected commissions can never be precisely predicted, "[t]he law must be equal to perfidy, whatever form it takes." *Id.* at 224, 384 *A.*2d 859 (Morgan, J.A.D., dissenting).

We acknowledge the recognized principle that land is inherently unique. We also recognize that Summer Company embarked upon an independent search for available properties once the Overpeck site was found to be objectionable. But we have no doubt whatsoever that C & W would have consummated the lease of the operations center but for defendants' tortious interference. *McCue v. Deppert,* 21 *N.J.Super.* 591, 597, 91 *A.*2d 503 (App.Div. 1952). Stated somewhat differently, there was a "reasonable probability" that C & W would have received the anticipated economic benefit had it not been for defendants' tortious conduct. *Leslie Blau Co. v. Alfieri,* 157 *N.J.Super.* at 185–86, 384 *A.*2d 859. In reaching this conclusion, we point to the unrefuted evidence that the Iganamort site and the Overpeck property were blended together in Hartz Mountain's marketing literature. The properties were virtually indistinguishable. Heller clearly considered the properties as one, and when Overpeck was found wanting, immediately proposed that the contemplated facility be moved to a slightly different location. It is plain beyond peradventure that, absent defendants' wrongful conduct, C & W would have earned its commission. "The action lies not only for interference with the fulfillment of an executed contract but also for malicious interference with the right to conduct negotiations which might culminate in such a contract." *McCue v. Deppert,* 21 *N.J.Super.* at 597, 91 *A.*2d 503. C & W was unlawfully deprived of that right and should thus be compensated for the wrong committed. C & W is therefore entitled to its commission earned on the operations center lease and to punitive damages.

### III.

The remaining points do not require extended discussion. We are entirely satisfied that punitive damages were warranted.

The Law Division reasonably found that defendants' conduct was "wantonly reckless or malicious." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49, 477 *A.*2d 1224 (1984); *see also Di Giovanni v. Pessel,* 55 *N.J.* 188, 191, 260 *A.*2d 510 (1970). However, we agree with C & W that its litigation expenses should have been considered in determining the amount of the award. *See Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 338–39, 627 *A.*2d 1081 (1993). Finally, we find no error in the assessment of interest from the date the original complaint was filed. *See R.* 4:42–11(b).

Accordingly, the judgment is affirmed in part and reversed in part. The matter is remanded to the Law Division for further proceedings consistent with this opinion.