44 N.J. Super. 159 (1957)
130 A.2d 48
GEO. H. BECKMANN, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CHARLES H. REID & SONS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND THOMAS E. GILL AND EILEEN A. GILL, HIS WIFE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 18, 1957.
Decided March 8, 1957.
*162 Before Judges CLAPP, JAYNE and FRANCIS.
*163 Mr. Thomas S. O'Brien argued the cause for plaintiff-appellant (Messrs. Greene and O'Brien, attorneys).
Mr. David M. Beckerman argued the cause for defendants-respondents Thomas E. Gill and Eileen A. Gill, his wife (Mr. Sanford Silverman, attorney).
The opinion of the court was delivered by CLAPP, S.J.A.D.
This action, so far as we need deal with it, was brought in a county district court by the plaintiff, a real estate broker, against the defendants Thomas E. Gill and Eileen A. Gill, his wife, the purchasers of a certain house and lot, which they bought directly from Charles H. Reid & Sons, Inc., the owner. The theory of the action is that the Gills deliberately induced the owner to believe that no broker was involved in the matter. The case was tried without a jury, and judgment was rendered in favor of the Gills. Plaintiff appeals.
In February or March 1954 Reid orally authorized the plaintiff to act as its broker in the sale of the property; besides it listed the property with other brokers and also reserved to itself the right to sell. In the course of its business plaintiff showed the premises to a number of prospective purchasers and on at least two occasions secured a deposit from a purchaser. To Gill it showed the property several times. In August or September 1954 the Gills gave plaintiff a deposit of $100 and signed a short form binder containing an agreement on their part to buy the place for $14,500, and also a statement fixing plaintiff's commission at 5%. Later the Gills induced the plaintiff to refund the $100 and destroy the binder, probably because they could not raise the necessary funds. A month later and (Gill denies this) possibly also in the Christmas holidays, plaintiff showed the Gills the house again. In early 1955 Reid posted a sign on the premises bearing Reid's name and telephone number and stating that the property was for sale. On February 28, 1955 Gill went back (as he admits) for the purpose of looking at the house (incidentally passing plaintiff's office on the way) and, seeing the sign, called Mrs. Reid *164 directly, making an appointment to inspect the place. In March 1955 the Gills entered into an agreement with Reid for the purchase of the property for $13,750.
Gill testified that he asked Reid on two occasions whether plaintiff was still concerned with the sale of the property and that Reid's answer was "no." He also testified that he felt that due to the interval existing between the time he last contacted the plaintiff and the time he first saw the house with the Reids, plaintiff had no right to commissions. The court itself then interposed, asking him why, if that was his feeling, had he asked Reid whether plaintiff had any interest in the matter. Contradictorily Gill replied that he was "not that dumb"; he knew plaintiff would be entitled to a commission in view of the fact that it first showed him the house.
Opposed to these claims of Gill that he inquired of Reid whether plaintiff had an interest in the matter, is the story of Mr. and Mrs. Reid, who were called by plaintiff on rebuttal (they were not parties, and the case had by then been dismissed as against the Reid corporation on the corporation's motion). The Reids testified that Gill never in any of his dealings referred to the plaintiff. Moreover Mrs. Reid said that when the Gills were shown the house by the Reids on March 1, 1955, they acted as though they were seeing it for the first time. We believe the Reids' version of the matter, largely because of a subsequent incident. On the day title closed in July 1955 plaintiff first learned of the transaction and forthwith made a claim for commissions. Reid's attorney then questioned Gill, asking him if he (Gill) had ever told Reid that it was the plaintiff who originally had shown him the house. Gill, when on the stand, testified in effect that to that question he answered "yes." However, the attorney, called by the plaintiff on rebuttal, contradicted him, saying that Gill then professed that plaintiff had not shown him the house originally. Gill, in giving his testimony, apparently falsified an important part of his story.
We think it probable, therefore, that the Gills, knowing plaintiff's interests in the matter, and in order to obtain a *165 reduction in the price of the property, purposely took steps to prevent plaintiff from securing a commission. This constitutes a tort. The leading case in the state dealing with the subject is Louis Kamm, Inc., v. Flink, 113 N.J.L. 582 (E. & A. 1934). Further see McCue v. Deppert, 21 N.J. Super. 591 (App. Div. 1952), and cases cited. It is to be noted that Gill himself arranged with Mrs. Reid for the inspection of the premises; that Gill and his wife looked through the house in the company of the Reids, and later he and his father called on Reid; and that the Gills by their own conduct  that is, by all these goings on, without the intervention in any way of a broker  definitely made it appear that they had found their way to the property without the aid of a broker. In addition to that, it is set forth in the record that when the Reids showed them the house, they "acted" as though they were seeing it for the first time; however, since we do not know precisely what actions justify this conclusory statement, we shall attach no weight to it. In any event it appears that the Gills' own conduct in these transactions induced the owner to believe that no broker was involved in the deal.
The parties' briefs agree upon one point, namely, that the Gills are not relieved of liability merely because plaintiff's authority was oral and its claim to commissions is therefore unenforceable as against the owner. N.J.S.A. 25:1-9. The authorities almost unanimously hold that the statute of frauds was enacted for the benefit of a party to the transaction and is not available to strangers who tortiously interfere with contractual or advantageous relations created by the transaction. Louis Kamm, Inc., v. Flink, 113 N.J.L. 582, 591 (E. & A. 1934); Louis Schlesinger v. Rice, 4 N.J. 169, 180 (1950); Weinstein v. Clementsen, 20 N.J. Super. 367, 371 (App. Div. 1952); McCue v. Deppert, 21 N.J. Super. 591, 596 (App. Div. 1952); cf. Louis Schlesinger Co. v. Wilson, 22 N.J. 576, 585 (1956); cf. also Aalfo Co. v. Kinney, 105 N.J.L. 345, 347 (E. & A. 1929); contra C.B. Snyder Realty Co. v. National Newark & Essex Banking Co., 14 N.J. 146, 164-165 (1953). For cases in other *166 jurisdictions, Jackson v. Stanfield, 137 Ind. 592, 36 N.E. 345, rehearing denied 37 N.E. 14, 15, 23 A.L.R. 588 (Sup. Ct. 1894); Vaught v. Jonathan L. Pettyjohn & Co., 104 Kan. 174, 178 P. 623, 624 (Sup. Ct. 1919); Cumberland Glass Mfg. Co. v. DeWitt, 120 Md. 381, 87 A. 927, 930 (Ct. App. 1913), affirmed 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1914); Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667 (Sup. Ct. 1955); Nokol Co. of Missouri v. Becker, 318 Mo. 292, 300 S.W. 1108, 1119 (Sup. Ct. 1927); Rice v. Manley, 66 N.Y. 82, 84 (Ct. App. 1876); Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176, 185 (Sup. Ct. 1954); Leibovitz v. Central Nat. Bank, 75 Ohio App. 25, 60 N.E.2d 727, 729 (Ct. App. 1944); Ringler v. Ruby, 117 Or. 455, 244 P. 509, 510, 46 A.L.R. 245 (Sup. Ct. 1926); Duckett v. Pool, 33 S.C. 238, 11 S.E. 689, 690 (Sup. Ct. 1890); Bitzke v. Folger, 231 Wis. 513, 286 N.W. 36, 40 (Sup. Ct. 1939); Restatement, Contracts, § 218, Illust. 1; Restatement, Torts, § 766c; 2 Corbin, Contracts, § 289 (1950); 2 Williston, Contracts (rev. ed. 1936), § 530. As stated in Prosser, Torts (2d ed.), 726, speaking of the tort we are now dealing with,
the law "indulges in the assumption that even unenforceable promises will be carried out if no third person interferes. Accordingly, it usually is held that contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, still afford a basis for a tort action when the defendant interferes with their performance."
1 Harper and James, Torts, § 6.7 (1956) observes:
"* * * it would seem that the rule [imposing liability on the tortfeasor] is the sound view. The object and policy of the law of contracts in denying an action on a contract within the provisions of the statute of frauds, obviously has little application to an action for inducing a breach, and the defendant's conduct, if unjustifiable in a case of an enforceable contract, is quite as reprehensible when the contract is unenforceable."
We turn next to one of the Gills' principal contentions. They claim that since the complaint charges them *167 with having interfered with a "contractual relationship" between plaintiff and Reid, they cannot be held in this action, because the plaintiff at the trial sought to establish that they interfered with a prospective contractual relationship between the persons stated. It is quite true, as the Gills say, that the listing of the property with the plaintiff, under the circumstances presented here, amounted merely to an offer by the owner to pay the plaintiff a commission if the plaintiff produced a purchaser able and willing to buy. When the broker produces the purchaser, a unilateral contract arises. Skene v. Carayanis, 103 Conn. 708, 131 A. 497, 498 (Sup. Ct. Err. 1926); Mechem, Outline of Agency (4th ed. 1952), § 560; cf. 2 Mechem, Agency (2d ed.), 2039. There is however nothing to the Gills' contention as to a variance; they are merely playing with the words in the complaint. Besides the matter was fully tried on the theory that the complaint had alleged a prospective contractual relation. R.R. 4:15-2; 7:1-3.
The four questions we deal with next, center about the issue of causation: did the Gills' conduct cause Reid not to pay a commission to the plaintiff; or was any cause of action plaintiff had against Reid barred by lapse of time or on some other basis, quite apart from the Statute of Frauds? Plaintiff certainly makes out its case on these questions, if it establishes that, had it had authority in writing, it would have been entitled to recover from Reid.
The first of these four questions is this: would the lapse of time between the last time (September or December 1954) the plaintiff showed the house to Gill and the time (March 1955) the contract of sale was executed have barred any cause of action plaintiff may have had against Reid? The trial court held that it would, and that plaintiff's "rights had expired" by reason of its own inactivity. On this basis and on the basis of its conclusion on the next question, the court denied plaintiff any recovery against the Gills. The testimony on plaintiff's behalf indicated that plaintiff showed the house to the Gills during the Christmas holidays in 1954. Gill denied this, and it is not entirely clear from the trial *168 court's finding whether it disbelieved or inadvertently overlooked the plaintiff's testimony in this particular. In any event there was this lapse of time amounting from two to six months.
It has been indicated in the Restatement, Agency, § 448d, that where a broker brings together a customer and the owner, and there is no substantial break in the ensuing negotiations, the broker ordinarily is to be held the efficient cause of the business and therefore to have entitled himself to compensation. Cf. First New Hampshire Corp. v. Van Syckle, 37 N.J. Super. 469 (App. Div. 1955); Murray Apfelbaum, Inc., v. Bernstein, 104 N.J.L. 664 (E. & A. 1928). Under the particular circumstances of this case however, though there was a lapse of two to six months as above stated, nevertheless the proofs establish that the broker's efforts, taken with the fact that the Gills had in the interim secured the necessary funds, probably constituted the procuring cause which served to bring together the owner and the buyer. Moreover, it appears that once they were brought together, there was no substantial break in the ensuing negotiations. In that situation in our opinion, the lapse of time should not be held to have barred any cause of action the broker may have had against Reid for commissions.
Second, would the lapse of about one year between the original listing of the property and the time of the contract of sale have barred any cause of action plaintiff may have had against Reid? The trial court held as to this,
"that the proofs did not disclose that the original listing of the property with the plaintiff still existed during any part of 1955, but on the contrary the defendant, Reid, undertook, by posting its for sale sign on the property [in early 1955], to sell the house itself, and plaintiff's rights had expired by lapse of time."
Where no time is specified, a broker's authority ordinarily expires after the lapse of a reasonable time. The question as to what constitutes a reasonable time raises under present circumstances an issue of fact. Breen v. *169 Levine, 32 N.J. Super. 525, 527 (App. Div. 1954), a case dealing with a lapse of some 14 months. The Restatement, Agency, § 446c, referring to the point, gives us one clue here, namely, by observing that in the "ordinary real estate transaction" a reasonable time "may be a considerable period." (Italics added) The underlying test, however, is simply this: is it reasonable, in view of all the circumstances, for the broker to believe that the owner still intends him to act? Restatement, Agency, § 105b. We conclude that under the circumstances presented, the plaintiff had reason to believe that Reid still intended it to act as broker in February 1955; Reid was doubtless still desirous of all the help it could get to dispose of the property. Hence we find that plaintiff's authority had not expired at that time. That being so, we can disregard the testimony as to several telephone conversations between plaintiff and Reid regarding the premises; we have neither the dates of these talks, nor information concerning what was said. It may however be noted, in passing, that the Restatement, Agency, § 105b (and see Illust. 4) has this to say on the subject, namely, that the broker's
"Authority may be kept alive beyond what otherwise would be a reasonable time by the fact that the principal knows that the agent is continuing to make efforts to perform and acquiesces therein."
Cf. Richard v. Spagna, 5 N.J. Misc. 33, 37 (Sup. Ct. 1926), affirmed 103 N.J.L. 711 (E. & A. 1927).
Third, would this lapse of one year and the fact that Reid did not, until the day of the closing, know of plaintiff's connection with the Gills, have barred any cause of action plaintiff may have had against Reid? Generally a broker's right to a fee is not dependent upon the owner's knowledge that the purchaser was procured through the broker's activity. McLaughlin v. Campbell, 78 N.J.L. 541, 548 (E. & A. 1909); Walsh v. Isgro, 121 N.J.L. 165, 169 (E. & A. 1938); Shafer v. Berg Embroidery Works, 109 N.J.L. 546 (E. & A. 1932). As the Restatement, Agency, § 448d, says,
*170 "nor is it necessary that the broker should personally introduce the customer * * *; he introduces the customer if, through any means which he uses to attract attention, the purchaser is led to the principal."
But the problem with which we are immediately concerned extends a little further than this. It is dealt with in Restatement, Agency, § 448f, as follows:
"Ordinarily, a broker who has been the effective cause of a transaction is entitled to the agreed commission although the principal does not know that the broker has played a part in the negotiations and although the principal, because of this ignorance, has made lower terms than he otherwise would have done * * *. Having promised the broker a commission, the principal ordinarily should know that the appearance of a customer may have been caused by the broker, and to avoid liability for payment he should make inquiries of the broker. On the other hand, the principal has no duty to pay him a commission if the broker has given the principal reason to believe that he has not caused the customer to appear, as where he has been inactive."
Compare Mechem's pointed observations on this subject. 2 Mechem, Agency (2d ed.), § 2436. However while we may raise up such a rule in the owner's interests where the broker has been inactive over a period of time, we see no justification for invoking the rule in order to rescue the Gills. For they were entirely aware of the plaintiff's role in the transaction, and indeed for their own self-enrichment they purposely set about to deprive the plaintiff of the rewards of its activities.
Fourth, would any cause of action plaintiff may have had against Reid have been barred by reason of the fact that it had authority apparently to sell the property for $14,500, whereas the price paid by the Gills was $13,750 ($14,000, with an allowance of $250 for not decorating)? It is entirely settled that a broker ordinarily earns his commissions when he procures for the owner a purchaser able and willing to meet either the price and the terms specified in the authority given him or such other price and terms as are satisfactory to the owner. Judge Jayne has collected the cases in this State dealing with the point. Marschalk *171 v. Weber, 11 N.J. Super. 16, 21 (App. Div. 1950). So here, the fact that the house may have been listed at $14,500, $750 more than the purchase price, would not have prevented plaintiff from recovering from Reid. Incidentally, it should not be overlooked that $14,500, less a 5% brokerage charge, comes to $13,775.
It is to be observed next that only a single broker is involved in the sale to the Gills and that the problem differs somewhat where there is more than one broker. Weinstein v. Clementsen, 20 N.J. Super. 367, 374 (App. Div. 1952); George F. Hewson Co. v. Hopper, 130 N.J.L. 525 (E. & A. 1943). See further Vreeland v. Vetterlein, 33 N.J.L. 247, 249 et seq. (Sup. Ct. 1869); Restatement, Agency, § 448e. The policy of the law, founded in the economics of free enterprise and individualism, which strives not to stifle legitimate competition  and which may relieve a broker of liability where through fair competitive means he makes a sale, interfering with another broker's business relations  does not however operate to relieve the Gills here. The Gills attempt to draw an analogy between the efforts of a competing broker and those made here by the owner to sell the property, namely, by putting up the sign in early 1955. But as we have already indicated, it was the plaintiff's endeavors, not the owner's sign, which probably were the procuring cause of the ensuing negotiations between Reid and the Gills.
The damages here, as evidenced by the above-mentioned binder, consist in the loss of a brokerage fee of 5% on the purchase price of $13,750, namely, $687.50. We cannot say on the basis of the proofs before us that the parties would probably have gotten together on a price of $14,500; plaintiff has therefore not established its right to a commission equal to 5% of $14,500.
Reversed, with directions to enter judgment in plaintiff's favor against the defendants Thomas E. Gill and Eileen A. Gill in the sum of $687.50.