261 N.J. Super. 554 (1993)
619 A.2d 623
HARPER-LAWRENCE, INC., A CORPORATION, AND JAIME WEISS, PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,
v.
UNITED MERCHANTS AND MANUFACTURERS, INC., A CORPORATION, AND ETIENNE AIGNER, A CORPORATION, DEFENDANTS-RESPONDENTS-CROSS-RESPONDENTS,
v.
ANNE GIBBONS T/A ELBERON DEVELOPMENT COMPANY, DEFENDANT-APPELLANT-CROSS-RESPONDENT, AND VANTAGE PROPERTIES, INC., A CORPORATION, AND VANTAGE NEW JERSEY, INC., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 1992.
Decided January 22, 1993.
*556 Before Judges GAULKIN, HAVEY and BROCHIN.
Donald F. Nicolai argued the cause for appellant-cross-respondent Anne Gibbons t/a Elberon Development Company (Lindabury, McCormick & Estabrook, attorneys; Mr. Nicolai, on the brief).
Herbert C. Klein argued the cause for respondents-cross-appellants Harper-Lawrence, Inc. and Jaime Weiss (Klein Chapman, attorneys; Mr. Klein, of counsel; Christopher J. McHattie and Leonard A. Peduto, on the brief).
Elaine Jacoby argued the cause for respondents-cross-respondents United Merchants and Manufacturers, Inc. and Etienne Aigner (Epstein, Becker & Green, attorneys; Ms. Jacoby, of counsel; Beverly A. Williams, on the brief).
Sarah T. Darrow, Deputy Attorney General, argued the cause for intervener-respondent New Jersey Real Estate Commission (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Ms. Darrow, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
*557 Plaintiffs Harper-Lawrence, Inc. and Jaime Weiss are realtors who claim they were entitled to a real estate commission because they procured defendant United Merchants and Manufacturers, Inc. as a tenant for a building which defendant Anne Gibbons, trading as Elberon Development Company, purchased from defendant Vantage Properties, Inc. or an affiliated company. To recover their commission, plaintiffs sued United Merchants, Ms. Gibbons, and Vantage Properties for breach of contract, tortious interference with contract, and tortious interference with prospective economic advantage.
Before trial, the court entered summary judgment dismissing plaintiff Weiss's claims. The court held that he was not legally entitled to maintain the suit because he had not been a licensed broker when he performed his services; he had been licensed as a broker-salesperson and had acted on behalf of his employer, Cushman & Wakefield of New Jersey, Inc., a licensed broker, which had a co-brokerage agreement with Harper-Lawrence[1].
After the presentation of all of the evidence, the court ruled that a prima facie case had not been established against Vantage Properties and dismissed all claims against it with prejudice.
The parties stipulated that the cross-claims for indemnification between Ms. Gibbons and United Merchants would not be submitted to the jury and would be decided by the court. Following the trial, the court ruled that neither was entitled to indemnification from the other.
*558 The jury returned its verdict by answers to special interrogatories. It found that Harper-Lawrence was the efficient procuring cause of a lease from Ms. Gibbons to United Merchants; that United Merchants had breached its contract with Harper-Lawrence, but Harper-Lawrence had suffered no damages from the breach; that Ms. Gibbons had not breached any contract with Harper-Lawrence; and that neither United Merchants nor Ms. Gibbons had interfered with any contractual relationship of Harper-Lawrence, but that both United Merchants and Ms. Gibbons had tortiously interfered with Harper-Lawrence's prospective economic advantage. The jury also determined that United Merchants was eighty percent and Ms. Gibbons twenty percent culpable for that tortious interference, and it awarded Harper-Lawrence $330,000 compensatory damages.
The trial court modified the verdict. Harper-Lawrence and Cushman & Wakefield had agreed that they would share equally in any commission received for leasing property to United Merchants. Cushman & Wakefield was not a party to the suit and did not seek a commission. The court ruled that Harper-Lawrence was therefore entitled to only $165,000 in damages, and it entered judgment for that principal amount against United Merchants and Ms. Gibbons, jointly and severally,[2] together *559 with prejudgment interest.[3] To reflect the jury's apportionment of fault, the judgment also awarded Ms. Gibbons $132,000 plus eighty percent of the prejudgment interest on her crossclaim for contribution against United Merchants.
Ms. Gibbons has appealed both from the judgment against her and also from the judgment in her favor on her crossclaim because it did not award her full indemnification. Mr. Weiss has appealed from the order for summary judgment which dismissed his claim. Harper-Lawrence has cross-appealed from the judgment in its favor because it was entered for the principal amount of $165,000 rather than for $330,000, the amount of the jury's verdict. United Merchants has not cross-appealed.[4]
For purposes of our review, we are required to accept as true all evidence supporting the jury's verdict and to draw all reasonable inferences in its favor wherever reasonable minds could differ. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). The following are the facts of the case viewed in that light.
In August 1986, Howard Ruderman, the "president" of a division of United Merchants consulted with Arthur Draznin, a senior vice-president of Harper-Lawrence, to obtain Mr. Draznin's assistance in finding suitable premises for the relocation of the division's warehouse and distribution facilities to a site *560 outside of New York City. Mr. Draznin was a New York real estate broker who was not licensed in New Jersey. He enlisted Jaime Weiss, whom he considered to be "the number one top industrial warehouse distribution broker in the State of New Jersey" to help locate an appropriate site. Through Mr. Draznin and Mr. Weiss, Harper-Lawrence and Cushman & Wakefield orally agreed to co-operate in the search and to share equally in any resulting brokerage commission.
In accordance with instructions from Mr. Ruderman, Mr. Draznin and Mr. Weiss met with Bruce Trattler, the general manager of Mr. Ruderman's division, and John Geniton, its controller, in order to learn their needs. Mr. Weiss then prepared a list of potentially suitable New Jersey locations, and Mr. Draznin sent it to Mr. Trattler and Mr. Geniton. On two occasions in August, Mr. Draznin and Mr. Weiss took them on a tour of several properties in New Jersey, including the property at 47 Brunswick Avenue, Edison, New Jersey, which was then owned by Vantage Properties or by one of its affiliates and which the parties refer to as the Vantage building. On September 18, 1986, Mr. Draznin and Mr. Weiss took Mr. Ruderman, Mr. Trattler, Mr. Geniton and one of their associates to see the Vantage building. They spent more than an hour at the site and met with four representatives of the owner of the property, including its president or partner-in-charge, who personally showed Mr. Ruderman through the building.
According to Mr. Weiss, during the September 18 visit, Geoffrey Schubert, a principal of Vantage Properties, told him, Mr. Draznin and the representatives of United Merchants that the building was about to be sold to "Elberon," the name under which Ms. Gibbons conducted her real estate business. Mr. Schubert assured them that United Merchants would still be able to lease the vacant space in the building and that, even after the sale, he would negotiate the lease on behalf of the new owner.
*561 Following Mr. Ruderman's September 18, 1986 visit to the building, he instructed Mr. Draznin and Mr. Weiss to obtain a statement of the terms on which Vantage Properties would be willing to lease the vacant 152,000 square foot portion of the building to United Merchants. Mr. Ruderman told Mr. Weiss, "Let's go for it. Let's get a leasing proposal from Vantage." Mr. Draznin or Mr. Weiss obtained a written proposal for a lease and sent it to Mr. Trattler on September 23. On September 24, 1986, Vantage Properties or its affiliate executed the agreement to sell its property to Ms. Gibbons. Title closed December 4, 1986.
A few days after sending the proposed lease terms to Mr. Trattler on September 23, 1986, Mr. Draznin asked him what he thought about the proposal. Mr. Trattler replied that the offer "looked good" and that he had sent it to Mr. Ruderman. From then until the middle of November 1986, Mr. Draznin called Mr. Ruderman "a half-dozen times." Mr. Ruderman told him that he and his associates "loved the building, [but] that things were on a holding pattern, that they were not moving ahead as rapidly as he anticipated, but they loved the building."
On November 13, 1986, Ms. Gibbons' property manager sent the following letter to Mr. Weiss:
Dear Jaime:
As you probably know, we are the Contract Purchasers for the property located at 47 Brunswick Ave., Edison, N.J. As per Geoff Schubert at Vantage Company, I understand that you have a client that showed some interest in leasing the available space at the above referenced building. Please be advised that we are anxious to make a deal on the vacant space. I think it would be in our best interest to arrange a meeting with your client, yourself and me to discuss the possible tenancy. I would ask that you arrange a meeting as soon as possible.... In closing, I would be pleased to sit down at any time to discuss anything you need to know regarding the building. I think you will find that our Company is a pleasure to do business with.
Mr. Weiss forwarded this letter to Mr. Trattler and then telephoned him, suggesting that his division's representatives meet with someone representing the new owner. The suggestion was not accepted. Although United Merchants offered a plausible alternative explanation for its failure to pursue the transaction *562 at that time, the jury could reasonably have inferred that the real reason was that the company was stalling in order to avoid paying a broker's commission when it consummated its plan to lease the building.
On November 20, 1986, Mr. Draznin wrote Mr. Ruderman, "Jaime and I look forward to pursuing this transaction with you and your team as soon as you are ready to proceed." The letter continues:
In the meantime, I would like you to consider appointing Cushman & Wakefield and ourselves to act as your exclusive representatives in the proposed relocation.
A proposed form of contract was enclosed with the letter. It read in part:
You [Harper-Lawrence and Cushman & Wakefield] agree to negotiate the terms of the lease and/or purchase on our behalf, however, all such negotiations shall be subject to our review and final approval.
Unless otherwise agreed, you agree to look only to the landlord or seller, as the situation may be, for your commission and we agree to recognize you as our broker in connection with any prospective locations submitted to us by you.
Mr. Ruderman declined to execute the proposed contract, but assured Mr. Draznin that United Merchants would "protect him as a broker." According to Mr. Draznin, that meant that "any of those properties that you show a customer they will respect your ability to negotiate on their behalf to secure that property. They will insure the fact that if you show it to them you will earn a commission." Harper-Lawrence and Mr. Weiss point to this exchange between Mr. Draznin and Mr. Ruderman as establishing the only express contract between their two companies.
Thereafter, Mr. Ruderman consistently failed to answer or return Mr. Draznin's calls. Before May 1, 1987, Ms. Gibbons appointed an exclusive broker to represent her in the leasing of space in her building. In the period before that date, while she was in the process of selecting her broker, Ms. Gibbons' property manager asked Mr. Weiss if United Merchants was still interested in the property. Mr. Weiss told him that the corporation's relocation project was still "on hold" as far as he knew, *563 but that a standard five percent commission would be expected if United Merchants leased the property from Ms. Gibbons. No response was testified to. As the result of that conversation or of a subsequent advertisement that Mr. Weiss received from Ms. Gibbons' brokers, Mr. Weiss sent Mr. Trattler a letter dated May 14, 1987, telling him that the Vantage building was still available and that the new owner was "anxious to work with you in connection with satisfying your requirement."
In the meanwhile, United Merchants met with a firm of consultants in February and March 1987, and hired them to advise it in connection with the proposed relocation of its warehouse and distribution facilities. The original scope of the services to be performed by the consultants included selecting the site for the new facilities. However, the jury could reasonably have concluded that the consultants did not make any significant contribution to selection of the site; they were informed of the division representatives' preference for the Vantage property in Edison, New Jersey, shown them by Mr. Draznin and Mr. Weiss, they were given a copy of the lease proposal from Vantage Properties, and they ratified the decision that had already been made.
In July 1987, Mr. Sidney Margolis, the executive vice-president of United Merchants who was in charge of all leasing of facilities for the corporation, called Ms. Gibbons to arrange a meeting to discuss leasing the Vantage property. The jury could have found that Ms. Gibbons then already knew, or was chargeable with her employee's knowledge, that while the property was owned by Vantage Properties, Mr. Weiss had shown it to United Merchants and that he was a broker associated with Cushman & Wakefield.
The meeting between Mr. Margolis and Ms. Gibbons took place on August 10, 1987 in Mr. Margolis's office in New York, ten days after the expiration of Ms. Gibbons' exclusive brokerage agreement with the firm she had appointed as her exclusive brokers for leasing the Vantage building. Mr. Ruderman was *564 present for the first fifteen minutes of the meeting. He told Ms. Gibbons that Mr. Jaime Weiss, a broker from Cushman & Wakefield, had shown him through the building while it was still owned by Vantage Properties.
The lease between United Merchants and Ms. Gibbons was negotiated at that meeting and during a meeting on August 28, 1987. It was executed on September 17, 1987. As submitted to Mr. Margolis, Ms. Gibbons' draft of the proposed lease included a representation that "neither party has contacted or consulted with a real estate broker." Because Mr. Weiss had shown the building to Mr. Ruderman, that language was deleted. Instead, the executed lease states:
The owner and tenant represent to each other that no broker has been instrumental in effecting this lease agreement. Each party does hereby agree to indemnify and save harmless the other from any claims made by any broker contrary to these mutual representations.
In the course of the negotiations between Mr. Margolis and Ms. Gibbons, the parties initially disagreed about the amount of rent to be paid. They ultimately agreed on the rent when Ms. Gibbons reduced her previously final demand by approximately five percent in response to Mr. Margolis's argument that no brokerage commission would be payable. No commission has been paid to any real estate broker in connection with this lease transaction.
Mr. Weiss argues on appeal that his claims were erroneously dismissed because neither his employment contract with Cushman & Wakefield, nor N.J.S.A. 45:15-1 et seq., the New Jersey Real Estate Licensure Act, is a bar to his suit.
Ms. Gibbons argues that her pretrial motion for summary judgment and her trial motion for judgment notwithstanding the verdict should have been granted because Harper-Lawrence was not the "efficient procuring cause of the lease transaction" with United Merchants; when she signed the lease, she had "no knowledge of Harper-Lawrence, Inc. or [of] its claimed prospective economic advantage"; and her conduct did not cause it any loss or interfere with any prospective *565 advantage that it may have had. She also contends that, as a matter of law, she could not have tortiously interfered with the prospective economic advantage of Harper-Lawrence because the jury found both that there was a contract between the brokers and United Merchants and that she had not interfered with it; the claim of Harper-Lawrence is barred by N.J.S.A. 45:15-1 et seq. because Mr. Draznin did not hold a New Jersey broker's license; and she is entitled to full indemnification from United Merchants. She also maintains that the verdict against her was against the weight of the evidence.
In support of its cross-appeal, Harper-Lawrence argues that it was entitled to the full $330,000 damages awarded by the jury, without reduction for any potential claim of Cushman & Wakefield.

-1-
We deal first with the question whether the order for summary judgment dismissing Mr. Weiss's claims was correct. For the following reasons, we hold that it was.
Mr. Weiss was employed by Cushman & Wakefield from approximately June 16, 1982 to August 21, 1987. Until the commencement of that employment, he had been licensed as a New Jersey real estate broker. During his employment by Cushman & Wakefield, he was licensed as a broker-salesperson. See N.J.A.C. 11:5-1.3. All of the services on which he predicates his claim for a commission were performed while he was employed by Cushman & Wakefield, and he rendered those services pursuant to a co-brokerage agreement which he entered into on behalf of his employer with Harper-Lawrence.
Cushman & Wakefield expressly declined to institute suit to collect a commission for leasing the Vantage property. It pointed out to Mr. Weiss that "since this transaction began during the time of your employment with Cushman & Wakefield, your employment agreement prohibits you from undertaking such a suit."
*566 The pertinent provisions of Mr. Weiss's employment contract state:
Employee shall not collect or receive any monies or other consideration for any real estate related business or services rendered other than in the name of, on behalf of and as an employee of [Cushman & Wakefield]
....
7. [Cushman & Wakefield] shall at all times have the sole and absolute right to determine the commission or fee to be charged to any customer....
....
(b). [Cushman & Wakefield] shall have the right to determine in its sole discretion whether or not any litigation or dispute shall be initiated, prosecuted, defended, compromised or settled, to determine counsel to be employed, and to determine the terms and conditions of any compromise or settlement. Any dispute or litigation in which employee is interested shall be prosecuted solely by, through and in the name of [Cushman & Wakefield].
N.J.S.A. 45:15-16 states, "No real estate salesman shall accept a commission or valuable consideration for the performance of any of the acts herein specified, from any person except his employer, who must be a licensed real estate broker." (See also N.J.S.A. 45:15-17m.) N.J.S.A. 45:15-3 forbids anyone to "bring or maintain any action ... for the collection of compensation" as a real estate broker or salesperson "without alleging and proving that he was a duly licensed real estate broker at the time the alleged cause of action arose." By virtue of these statutes, if Mr. Weiss was a "real estate salesman," and not a "broker," when he performed the services for which he has asserted a claim in this suit, he has no cause of action for a commission against anyone except Cushman & Wakefield. See Byrne v. Peoples' Bond & Mortgage, Co., 99 F. Supp. 195 (E.D.Pa. 1951) (real estate salesman could recover his commission only from his employer who was a broker). Harper-Lawrence and Mr. Weiss have therefore directed their efforts to arguing that he was a "broker," not a "salesman," within the meaning of the statutory classification and that, if N.J.A.C. 11:5-1.3, the regulation which denominates him a broker-salesman, is interpreted to subject him to the statutory restrictions on salesmen, the regulation is ultra vires and void. The New Jersey Real Estate Commission, which has intervened *567 to support the validity of the regulation, argues strenuously to the contrary.
We do not have to determine the validity or effect of N.J.A.C. 11:5-1.3 in order to decide the present case, and we shall therefore refrain from doing so. Common-law grounds are dispositive. Mr. Weiss concedes that when he procured United Merchants as a tenant for the Edison building, he was acting as an employee of Cushman & Wakefield. In the absence of specific authorization, an agent or employee cannot sue in his own name to recover compensation due to his principal or employer. Greten v. Passaic Bergen Bottle Co., 125 N.J.L. 387, 15 A.2d 644 (E. & A. 1940); Restatement, (Second) of Agency § 370 (1957); cf. DeBenedictis v. Gerechoff, 134 N.J. Super. 238, 339 A.2d 225 (App.Div. 1975) (real estate salesman's right to compensation from his broker-employer depends on the terms of the agreement between them). Mr. Weiss was not authorized to sue to collect a commission to which Cushman & Wakefield may have been entitled. In fact, as we have pointed out, his employment agreement expressly forbade him from doing so[5]. The order for summary judgment dismissing his claims was therefore properly entered.

-2-
We turn next to Ms. Gibbons' appeal from the judgment entered on the jury's finding that she tortiously interfered with Harper-Lawrence's prospective economic advantage. She contends, *568 among other things, that she was entitled to a judgment in her favor notwithstanding the jury's verdict because, even if all evidence in favor of Harper-Lawrence's claim is accepted as true and all reasonable inferences are drawn in its favor, Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969), the necessary elements to establish tortious interference with prospective economic advantage have not been proved.
To establish that cause of action, Harper-Lawrence, Inc. was required to prove
1) unlawful, intentional interference with [its] prospect of, or reasonable expectation of, economic advantage, and 2) a reasonable probability that plaintiff would have received the anticipated economic benefits had there been no interference.
[Snyder Realty v. BMW of N. America, 233 N.J. Super. 65, 76, 558 A.2d 28 (App.Div. 1989) certif. denied, 117 N.J. 165, 564 A.2d 883 (1989).]
Proof of the first element required a showing that Ms. Gibbons' conduct was "both injurious and transgressive of generally accepted standards of common morality or of law." Sustick v. Slatina, 48 N.J. Super. 134, 144, 137 A.2d 54 (App.Div. 1957) (quoting from Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 255, 128 A.2d 281 (App.Div. 1957)). Stated in other words, whether the alleged tortfeasor's conduct constitutes tortious interference with prospective economic advantage depends on whether that conduct is "sanctioned by the `rules of the game.'" Sustick, supra, 48 N.J. Super. at 144, 137 A.2d 54; see also Harris v. Perl, 41 N.J. 455, 461, 197 A.2d 359 (1964) (The law protects against "sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated.")
In the present case, the jury could reasonably have found that when Sidney Margolis, the executive vice-president of United Merchants telephoned Ms. Gibbons in July 1987 to arrange a meeting to discuss leasing the Vantage building, she or one of her employees already knew that Mr. Jaime Weiss of Cushman & Wakefield was the broker who had introduced her *569 prospective tenant to the property.[6] If she did not know then, Mr. Ruderman told her so at the beginning of her August 10, 1987 meeting with Mr. Margolis. Ms. Gibbons did not inform Mr. Weiss or, insofar as appears from the record, anyone else at Cushman & Wakefield, that she was about to negotiate or execute a lease with United Merchants. During the course of bargaining with Mr. Margolis about the rent to be paid, Ms. Gibbons was able to reach an agreement by reducing her demand because she would not be obligated to pay a broker's commission. She has not paid or offered to pay a commission to a broker for procuring United Merchants as a tenant. Harper-Lawrence has not pointed out any other actions or inactions attributable to Ms. Gibbons which it claims amounted to "sharp dealing" or "overreaching" or violating the "rules of the game." The legal question for us to decide is whether these actions or inactions could reasonably be so characterized.
The decided cases in which a broker recovered a judgment against a buyer or lessee for tortious interference with the broker's prospect of earning a commission provide some guidance. In Myers v. Arcadio, 73 N.J. Super. 493, 180 A.2d 329 (App.Div. 1962); Geo. H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159, 130 A.2d 48 (App.Div. 1957); and McCue v. Deppert, 21 N.J. Super. 591, 91 A.2d 503 (App.Div. 1952), the buyers misrepresented to the owners that no broker had been responsible for the sale or lease for which the broker sought a commission. In each of these cases, the property owner had enlisted the help of a real estate broker to find a buyer and had promised to pay the broker a commission, but the promise was oral and was therefore unenforceable. See N.J.S.A. 25:1-9. The trier of fact could therefore reasonably *570 conclude that if the seller had known when he agreed with the buyer on the terms of the sale that the broker had been instrumental in effecting the transaction, the seller would probably have paid a commission. If the buyer or lessee who suffered the judgment for tortious interference asked what he should have done differently, he could have been told that he should not have lied. His misrepresentation was the reprehensible conduct that made him liable.
In Brenner v. Perl, 72 N.J. Super. 160, 178 A.2d 19 (App.Div. 1962), the seller and the broker had a written contract. But it provided that the seller would pay a commission only if the broker arranged a sale before the commission agreement expired. Id. at 165, 178 A.2d 19. The court granted summary judgment in favor of the seller on the contract claim because the sale was arranged after the expiration of the commission agreement. However, it denied summary judgment on the broker's claim for tortious interference because there was deposition testimony tending to show that the seller had secretly counseled the prospective buyer to withhold his offer until after the broker's listing agreement had expired. In this case, too, the reprehensible conduct that made the seller liable for tortious interference was misrepresentation or conspiracy to misrepresent.
In the present case, the record does not show that Ms. Gibbons made any material misrepresentation. Neither United Merchants nor Harper-Lawrence claims that it relied on any statement of hers to its prejudice, and United Merchants knew more about the brokers' role than she did. In that critical respect, this case is distinguishable from Myers, supra, Geo. H. Beckmann, Inc., supra, McCue, supra, and Brenner, supra.
In Sustick v. Slatina, supra, 48 N.J. Super. at 138-9, 137 A.2d 54, the broker showed the buyers a house that was available for sale. At their request, he transmitted their offer to the owner and asked the owner for a written exclusive agency agreement. The seller declined to sign a written agreement, *571 but assured the broker that "if he could get a buyer, he would be only too willing to pay a commission but that it was not necessary to put their agreement in writing." In response to the owner's inquiry, the broker disclosed the name of the prospective buyers. After the exchange of an offer and counter-offer, the seller's asking price was still more than the buyers were willing to pay. Eventually, the buyers told the broker "to forget about it ... they were not interested in the house any more...." Id. at 139, 137 A.2d 54. A short time later, the sellers and buyers met and the house was sold at what was in effect the seller's previously stated asking price less the broker's commission. The jury returned a verdict in the broker's favor against both the seller and the buyers for six percent of the purchase price based on their tortious interference with prospective business advantage, and this court affirmed the judgment against both the seller and the buyers.
We explained the basis of the buyers' liability as follows:
The [buyers] had had previous dealings with [the broker] and knew he was a real estate broker. They solicited his active assistance in finding them a new home. He had interested them in the [seller's] property. Nevertheless, without giving him a reasonable opportunity to conclude a satisfactory deal, and after telling him they were no longer interested in the property, as the jury could have found, they went directly to the owner without [the broker's] knowledge and negotiated and purchased the property at a lower price, but getting their lower price at the expense of [the broker's] commission.

[Id. at 145, 137 A.2d 54.]
In other words, the buyers had induced the broker to expend his time and to disclose to them his information about the availability of properties by leading him to expect that, in accordance with the customary dealings between brokers and prospective buyers, they would  in the language which Mr. Weiss attributed to Mr. Ruderman of United Merchants  "protect" him; that is, give him the exclusive opportunity to approach the owner and negotiate the transaction on their behalf. If the buyers had asked what they should have done to avoid liability for tortious interference, the answer would have been *572 that they should not have dealt directly with the owner without according the broker the opportunity to negotiate to which he was fairly entitled; that conduct on their part was contrary to the "rules of the game." Id. at 144, 137 A.2d 54.
About the basis for the seller's liability in Sustick v. Slatina, supra, we said:
[The seller] also could have been found by the jury to have acted in an unjustifiable fashion in relation to [the broker]. He knew [the broker] had a prospective purchaser, he promised him a commission, learned the name and address of the purchasers from him, but then acted in concert with the [buyers] for the purpose of profiting by the elimination of [the broker's] commission, without giving [the broker] a reasonable opportunity to bring the parties together at a mutually satisfactory price. The jury could have found that [the seller's] contribution to the [broker's] injury was wrongful in that he interfered with the relationship between [the broker] and the [buyers] as their agent in procuring a new home [citation omitted] and therefore, necessarily, that his actions constituted interference with [the broker's] brokerage expectancy.

[Id. at 145, 137 A.2d 54.]
Although the agreement between the broker and the seller in Sustick was oral, we treated it as enforceable because the statute of frauds had not been pleaded and was therefore waived. However, we dealt with the seller's liability solely on the theory of tortious interference with prospective economic advantage. The gist of his wrongdoing was to deal directly with the prospective buyers after he had induced the broker to tell him their names and addresses by promising to pay the broker a commission if his customers purchased the property. That conduct, we said, interfered with the buyers' relationship with the broker. However, the broker's only prospective profit from that relationship was the commission that the seller had promised to pay. Consequently, Sustick appears to hold that a party can become liable for prospective interference by interfering with his own contract. That holding has been overruled sub silentio by Printing Mart v. Sharp Electronics, 116 N.J. 739, 752-53, 563 A.2d 31 (1989).
In Harris v. Perl, 41 N.J. 455, 197 A.2d 359 (1964), the broker had a commission agreement with the party whom she thought *573 owned the property. But without the broker's knowledge, that party had deeded it to a bank in lieu of foreclosure. The buyers discovered the broker's error and, without telling her, bought the property directly from the bank. The Court held that when the buyers learned the identity of the true owner, they were obligated to inform the broker and give her a reasonable opportunity to obtain the bank's agreement to pay her a commission and to negotiate on the buyer's behalf. The opinion states:
We think it perfectly clear that the bank would have recognized plaintiff as broker if she had sought recognition before the identity of her prospect was revealed. The question then is whether a person who accepts the services of a broker may surreptitiously appropriate those services to his own profit by buying directly from the owner and justify that action on the ground that the broker had not established some relationship with the seller.

[Id. at 461, 197 A.2d 359.]
The Court's short answer was, "[I]f the purchaser beats the broker out of his commission by buying from the owner directly or through a front, thus appropriating to himself the value of the services of the broker, he should pay for that mischief." Id. at 463, 197 A.2d 359. It elaborated as follows:
And so here, when the [buyers] accepted [the broker's] services, it was with the obligation which all decent men would recognize, that they would not line their purse with the money value of those services. It is of no moment that [the ostensible owner with whom the broker had a commission agreement] was not the agent of the bank and hence [the broker] had no authority from the record owner. That fact provided an opportunity for overreaching rather than a justification for it.... In these circumstances fair play would require a prospective purchaser to permit the broker to seek recognition by the owner, unenticed by the purchaser's offer to deal directly. As we have already said, we have no doubt the bank would have dealt with [the broker], but the [buyers] did not give her that opportunity. More than that, [the buyer] lured [the broker] from stumbling upon the truth by deceitfully saying he would discuss the sale after the Labor Day weekend.

[Id. at 464, 197 A.2d 359.]
In other words, to the question what should the buyers have done differently, the Court responded that, after the buyers had gotten the benefit of the broker's efforts, they should have *574 given the broker the opportunity to approach the owner to obtain a commission agreement and to negotiate a sale on behalf of the buyers while the broker retained the leverage afforded her by her undisclosed knowledge of the identity of a prospective purchaser; their wrongdoing was to have taken advantage of the broker's services and then to have undercut her ability to bargain for a commission.
The present case is unlike Harris and Sustick because Ms. Gibbons did not make an inequitable use or disclosure of information confided to her by the brokers or incur any moral obligation to them by causing them to expend efforts or disclose information at her behest or in a reasonable reliance on anything that she said or did. The Vantage building was shown to Mr. Ruderman on September 18, 1986; the terms of a proposed lease were sent to Mr. Trattler on September 23, 1986. By December 4, 1986, when Ms. Gibbons closed title to the Vantage building and even by September 24, 1986, when the contract to acquire it was executed, Messrs. Drazin and Weiss had performed all of the services upon which they predicate their claim for a commission.[7]
The reported New Jersey case whose facts are closest to the present one is Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 384 A.2d 859 (App.Div. 1978) certif. denied, 77 N.J. 510, 391 A.2d 523 (1978). In that case, a liquor distributor retained a broker to locate a site for a distribution warehouse and office space. The broker and the distributor agreed that the broker would look only to the property owner for its commission. The broker located a 44-acre, unimproved tract owned by defendant Cali; the distributor needed between 11 and 15 acres of that *575 tract for its facilities. Cali agreed[8] with the broker that if he sold or leased the property to the distributor, Cali would pay the commission. After protracted discussions, the distributor and Cali substantially agreed on the terms of a lease. The distributor would solicit competitive bids for construction and leasing of a facility on the Cali site; the bidders were to assume a purchase price of approximately $675,000 for the property and to include a $67,500 broker's commission in their cost calculations; when all the bids were in, Cali would match the lowest bid, build the facility, and lease it to the distributor. But before the bids were received, Cali secretly contracted to sell his entire 44-acre tract to another developer, defendant Alfieri. Alfieri constructed the facility and leased it to the distributor on the terms which the distributor and Cali had agreed to, but Alfieri refused to pay a commission to the broker. The broker sued the distributor, Cali and Alfieri. Before trial, the court granted summary judgment dismissing the claim against the distributor. The jury returned a verdict only against Alfieri.
On appeal, this court, with one judge dissenting, affirmed the judgment entered on the jury's verdict. Answering the question, "What did the Alfieri defendants do to make them liable," the majority opinion said:
The jury could have found that they procured the Cali defendants to continue to act as the owner of the land when in fact the latter no longer were the decision makers. Alfieri even decided the amount of rental under the lease (which included a commission) Cali was to have discussed with [the distributor] on May 3, 1973. They remained silent when they should have spoken. They permitted plaintiff as well as [the distributor] to perform as if the contemplated negotiations were progressing to a finality. They conspired to hold [the distributor and the broker] in limbo until they were ready to announce the new ownership and, in the meantime, to neutralize [the broker] from attempting to persuade its clients, the [distributor], to look elsewhere for an appropriate site  a site whose owner would pay commissions for [the broker's] services.

[Id. 157 N.J. Super. at 188, 384 A.2d 859.]
*576 The present case is unlike Leslie Blau Co. because there is no evidence that Ms. Gibbons concealed her acquisition of the property from anyone. The November 13, 1986 letter from Ms. Gibbons' property manager to Mr. Weiss informing him of her contract to purchase the property and suggesting a meeting to discuss a lease fully disclosed her ownership. She implicitly invited a contract to pay a brokerage commission, but Mr. Weiss did not respond.
United Merchants has not appealed from the judgment against it. Nonetheless, focusing for a moment on its conduct will facilitate our analysis of the conduct of Ms. Gibbons on which Harper-Lawrence predicates her liability. The conduct of United Merchants was a classic instance of a prospective lessee's interfering with a real estate broker's prospect of earning a commission. The jury's verdict established that Harper-Lawrence and its agent, Cushman & Wakefield, were instrumental in causing United Merchants to lease space in the Vantage building. The jury also found that United Merchants had a contract with Harper-Lawrence. Harper-Lawrence argues, and we agree, that the only such contract that the jury could reasonably have found was the contract of United Merchants to accord Mr. Weiss and Mr. Draznin the opportunity to negotiate on its behalf for any lease of which they were the "efficient procuring cause." That agreement implied that United Merchants would not disclose its identity to the owner of the building because doing so would undercut the brokers' ability to obtain its agreement to pay a commission. The wrongdoing of United Merchants that is the predicate of its liability is its dealing directly with Ms. Gibbons without giving Harper-Lawrence a reasonable opportunity to obtain Ms. Gibbons' agreement to pay it a commission. See Harris v. Perl, supra; Sustick v. Slatina, supra.
When Mr. Weiss and Mr. Draznin showed the Vantage building to the representatives of United Merchants, they presumably *577 had or expected to obtain a commission agreement from Ms. Gibbons' predecessor in title, the company that then owned the property. The jury found, without challenge on appeal, that Ms. Gibbons had no contract with Harper-Lawrence and, by implication, since Cushman & Wakefield was acting as Harper-Lawrence's agent, that she had no contract with Cushman & Wakefield on which Harper-Lawrence was entitled to rely. Therefore, even if Ms. Gibbons knew not only that Harper-Lawrence or Cushman & Wakefield had shown the Vantage building to representatives of United Merchants, but that they had also been, as the jury found they were, the "efficient procuring cause" of United Merchants' decision to lease space in the Vantage building, she had no obligation to pay a broker's commission. Sharp v. Hoopes, 74 N.J.L. 191, 64 A. 989 (Sup.Ct. 1906) (If, without a contract, a broker introduces a tenant who rents as a consequence, the owner has no legal obligation to pay the broker a commission, and a subsequent promise to do so lacks consideration.) See Bruni v. Poslusny, 56 N.J. Super. 525, 530-31, 153 A.2d 739 (App.Div. 1959) ("To entitle a real estate broker to compensation for services rendered there must first exist a contract of his employment, which may be either express or implied."); Soloff v. Josephson, 21 N.J. Super. 106, 109, 90 A.2d 891 (App.Div. 1952) (same). To hold that the owner of a building who has no express or implied contract with a broker becomes liable to pay the broker a commission by merely leasing space to a tenant to whom the broker has shown the property would mean that a broker can thrust his services on an owner, unasked, and create a right to compensation without contractual authorization. The decided cases are to the contrary, and to hold that an owner is precluded from leasing to a tenant under these circumstances is subject to the same objection. We adhere to the rule that a real estate broker's claim to a commission depends on a valid contract.
There is no proof in the record that Ms. Gibbons did anything immoral or contrary to "the rules of the game" or that she was *578 legally obligated to do anything differently. Since liability for tortious interference with prospective economic advantage depends on proof of the alleged tortfeasor's wrongdoing, see Harris v. Perl, supra, 41 N.J. at 461, 197 A.2d 359, we conclude that the judgment against her, which was predicated entirely on the jury's verdict that she had tortiously interfered with Harper-Lawrence's prospective economic advantage, cannot be sustained. Her motion for judgment notwithstanding the verdict should have been granted.
Since United Merchants has not appealed, there is no need for us to consider the other grounds on which the judgment in favor of Harper-Lawrence has been challenged and we therefore decline to do so.
We next consider Ms. Gibbons' appeal from the trial court's ruling that she is not entitled to full indemnification from United Merchants despite its representation, contained in the lease, that "no broker has been instrumental in effecting this lease agreement." Our decision in Ms. Gibbons' favor moots her claim to be indemnified against any damage award in favor of Harper-Lawrence, but it does not moot her claim for attorneys' fees. If Ms. Gibbons did not know that the representation was false when made, her attorneys' fees incurred in defending against the claims of Mr. Weiss and Harper-Lawrence were a direct consequence of United Merchants' falsehood and are therefore recoverable as damages. See State v. Ventron, 94 N.J. 473, 503-4, 468 A.2d 150 (1983). An appropriate hearing may be necessary to determine whether Ms. Gibbons relied on the representation and, if she is entitled to be indemnified for her attorneys' fees, to determine their amount.
The trial court's reduction of the award in favor of Harper-Lawrence from $330,000 to $165,000 was clearly correct. Harper-Lawrence's claim is for damages for loss of its commissions. Its co-brokerage agreement with Cushman & Wakefield required the two firms to share any commissions equally. Cushman & Wakefield, for whatever reasons, has waived its *579 claim. Harper-Lawrence is entitled only to the amount which it would have earned but for the tortious interference of United Merchants. That amount is $165,000 plus interest as awarded by the trial court.
The judgment appealed from is vacated and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.
NOTES
[1] In opposing the motion for summary judgment, plaintiffs argued that N.J.A.C. 11:5-1.3 was unconstitutional. The New Jersey Real Estate Commission intervened before the trial court and appeared before us as a respondent to support the constitutionality of the regulation and to express the Commission's views on its interpretation. At our request, the Commission also submitted a supplementary brief on another issue in the case involving the interpretation of the statutes regulating real estate brokers and salespersons.
[2] N.J.S.A. 2A:15-5.3 as amended by L. 1987, c. 325, § 2, provides that a judgment creditor recovering damages for any except an environmental tort can collect from a party determined to be 20 percent or less responsible for total damages "Only that percentage of the damages directly attributable to that party's negligence...." Although this statute refers only to damages for negligence, it is also applicable to intentional torts. Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991). However, the statute became effective December 18, 1987, and was made applicable only to "causes of action arising on or after that date." L. 1987, c. 325, § 4, quoted in "Historical and Statutory Notes" following N.J.S.A. 2A:15-5.2. Plaintiffs' cause of action for tortious interference with prospective economic advantage arose no later than September 17, 1987, when the lease between Gibbons and United Merchants was signed. The 1987 amendment is therefore inapplicable to the present suit. Prior to the effective date of the amendment, the statute read:

The party so recovering may recover the full amount of the molded verdict from any party against whom such recovering party is not barred from recovery. Any party who is so compelled to pay more than such party's percentage share may seek contribution from the other joint tort-feasors.
[3] $26,640.28 of prejudgment interest was awarded against United Merchants and $25,265.33 against Gibbons.
[4] During the trial, United Merchants filed a petition for reorganization under the federal bankruptcy laws. The bankruptcy court promptly modified the automatic stay provided by federal law, see 11 U.S.C. § 362, to permit the trial to continue.
[5] Mr. Weiss has argued that his employment contract is immaterial because a "party cannot enforce provisions of a contract to which he is not a privy, unless it is clear that the parties to the contract intended to confer upon him the right to enforce it," quoting First National State Bank of N.J. v. Carlyle House, Inc., 102 N.J. Super. 300, 322, 246 A.2d 22 (Ch.Div. 1968). The proposition is correct, but immaterial. The defendants are not seeking to enforce Mr. Weiss's contract. They merely point to it as evidence that if United Merchants or Ms. Gibbons owed a commission to anyone, they owed it to Cushman & Wakefield, not to Mr. Weiss, and he has no contractual right to assert his employer's claim.
[6] For purposes of our decision, we assume that, with respect to Ms. Gibbons, Harper-Lawrence was Cushman & Wakefield's undisclosed principal. Consequently, whether she knew or should have known about Harper-Lawrence is immaterial. Cf. Restatement Agency § 302 (Person who makes contract with agent is liable to the undisclosed principal as if the person has contracted with the principal).
[7] Vantage Properties, Inc., Ms. Gibbons' predecessor in title, probably had at least an implied commission agreement with Cushman & Wakefield. But that agreement did not become binding on Ms. Gibbons when she acquired the property.
[8] Our opinion reports that the broker sent Cali two letters pursuant to N.J.S.A. 25:1-9 confirming his obligation to pay a broker's commission in the event of a sale or lease, thus implying that Cali had orally agreed to pay the commission.